[Nos. 6309–3–II; 6316–6–II. Division Two. June 26, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN
FREDRICK ANDERSON, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT
ROSS STRATTON, *Appellant.*

*David W. Murdach,* for appellant Anderson (appointed counsel for appeal).

*Ronald Culpepper,* for appellant Stratton (appointed counsel for appeal).

*William H. Griffies, Prosecuting Attorney,* and *Barbara L. Corey–Boulet, Deputy,* for respondent.

PETRICH, J.—In consolidated appeals John Fredrick Anderson and Robert Ross Stratton challenge convictions on multiple counts of aggravated first degree murder and first degree assault after a joint jury trial.

The issues common to both appeals are:

1. Whether the probative value of evidence of unrelated prior offenses was exceeded by its prejudice.

2. Whether the penalty of life without the possibility of parole is constitutionally permissible, and whether the statutory scheme authorized the procedural steps employed by the State in seeking such penalty.

Anderson raises the following issues:

1. Whether pretrial publicity linking Anderson to several violent crimes required a change of venue.

2. Whether the information supporting the issuance of a search warrant was stale; whether a polygraph test result was improperly considered in determining veracity of the informant; and whether the search was extended beyond the limits of the warrant.

3. Whether a prima facie showing of a conspiracy had been established and whether the extrajudicial statements of a nontestifying codefendant were made during the course

of and in furtherance of a conspiracy so as to remove such statements from the ambit of inadmissible hearsay.

4. Closely allied to the issues concerning the coconspirators' statements is whether a severance of defendants' trials should have been granted.

Stratton's appeal presents the following issues:[1]

1. Whether the prosecutor's questioning of a State's witness concerning a polygraph test requires a mistrial.

2. Whether expert testimony concerning spectrophotometer analysis and shell case markings was so speculative as to require its exclusion.

3. Whether prosecutorial misconduct deprived him of a fair trial because of:

 a. Prosecutor's unsworn statement purporting to explain the source and possession of certain sums of money by one of the defendants;

 b. Prosecutor's questions about a polygraph test administered to one of the State's key witnesses;

 c. Prosecutor's questions of a State's witness as to whether he feared Stratton.

4. Whether the facts justified a jury instruction on a lesser included offense of murder.

We are satisfied that Anderson was entitled to a severance because certain coconspirators' extrajudicial statements not in furtherance of the conspiracy were improperly admitted in evidence and, despite all other assignments being without merit, we are unable to hold that the error in refusing severance was harmless beyond a reasonable doubt. We therefore affirm Stratton's convictions and sentences but reverse as to Anderson and remand for a new trial.

The genesis of this case was a contract killing in Thurston County on February 19, 1979. Joyce Hernandez agreed

---

[1]Stratton without additional assignments of error adopts by reference the issues and arguments presented in Anderson's brief. To the extent such issues and arguments support Stratton's assignments of error they have have been considered by the court. He has not adopted Anderson's specific assignments of error. In any event, Anderson's assignments of any merit are peculiar only to Anderson.

to pay Stratton $10,000, later increased to $15,000, to shoot and kill her husband, Jesse Hernandez. Denying involvement to the police, Hernandez eventually confided in Jim Hall, a bartender at the Yorktown Restaurant in Pierce County, detailing her husband's murder as well as a jewelry insurance scheme proposed by Stratton. Believing that Hall had told a third person about the contract murder and insurance scheme, and fearing reprisals, Hernandez approached Stratton and told him of her conversations with Hall.

On December 18, 1979, at approximately 10 p.m., an unidentified lone gunman dressed in black clothing, a ski mask, and gloves entered the lounge of the Yorktown Restaurant through a rear door. Without a word, the gunman fired eight rounds from a .45 semi–automatic pistol. When the smoke cleared, three lounge customers lay dead and three seriously wounded. Joyce Hernandez and Jim Hall were in the lounge during the shooting, but were unharmed.

The State contends that Anderson did the shooting at Stratton's request to keep Hernandez quiet and to persuade her to continue paying for Jesse's killing. In support of the State's theory, the prosecution introduced, over objection, evidence of two crimes in King County. On December 13, 1979, Anderson and Larry White robbed the Casa Lupita restaurant in Seattle. White drove the getaway car while Anderson proceeded inside with a black bag in which he carried pistols, gloves, ski mask, wig, and a hat. Anderson's .45 semi–automatic pistol accidentally discharged but no one was hurt. On January 13, 1980, Anderson, Stratton, and White robbed the South China Doll restaurant in South King County. The restaurant manager, Henry Gee, tried to prevent Anderson's escape. A salvo from Anderson's .45 semi–automatic pistol left Gee dead in the parking lot.

White was arrested on January 27, 1980, in connection with a number of King County robberies. In exchange for immunity, White described to the police Anderson's and Stratton's involvement in the South China Doll robbery–

homicide, the Yorktown shootings, and the Thurston County contract murder of Jesse Hernandez. Stratton and Anderson were arrested at a Federal Way residence where, at one time, White lived with the two.

Supported by an affidavit, a search warrant was issued on March 11, 1980, to search the Federal Way residence. The search produced numerous bullet casings bearing a red polish mark and several weapon components, including a "slide" to a .45 semi-automatic pistol. A second search warrant issued on March 21, 1980, ostensibly to look for specific clothing used in the King County crimes, revealed a .45 semi-automatic pistol, a .357 pistol, and ammunition stashed in the barrel of a commercial vacuum cleaner. On the same day, a third search warrant was obtained to search the vacuum cleaner.

The prosecution's criminologist testified at trial that the shell casings recovered from the Yorktown and the shell casing recovered from the Casa Lupita had been fired by a weapon utilizing the "slide" retrieved on the first search of the residence. He further testified that the "slide" recovered on the .45 semi-automatic pistol in the vacuum cleaner had fired the shells at the South China Doll. A spectrophotometric analysis revealed that the red polish on the shell casings recovered from the different crimes was chemically identical.

Hernandez and White testified for the State. Although unable to identify Anderson as the masked gunman, Hernandez recalled that the gunman was of a size and build similar to Anderson. White did not witness the carnage at the Yorktown Restaurant. However, he testified that on that night at about 9 p.m., Anderson left the house—which was shared by White, Anderson, Stratton and Stratton's girl friend—carrying the black bag he had used on other occasions to carry pistols, gloves, a ski mask, wig and hat. Anderson returned shortly after White had heard of the Yorktown shootings on the 11 p.m. news broadcast. Anderson then sat and listened to a police scanner and appeared agitated. White also testified that Anderson owned equip-

ment used to reload expended shell casings, identified the .45 semi–automatic pistol recovered in the search of the premises as the one possessed by Anderson and said that the weapon had interchangeable slides and barrels. Over continuous objections Hernandez and White recounted statements made by Stratton that implicated Anderson as the Yorktown gunman.[2]

The jury found each defendant guilty and further found aggravating circumstances. The trial court denied motions for new trials, sentencing each to three life terms without parole (murder) and three life terms (assault) to run consecutively.

## I
### CHANGE OF VENUE

As the basis for the motion for change of venue, the defense cited the publicity surrounding the Yorktown incident, the Casa Lupita and South China Doll prosecutions of Anderson in King County, and the murder prosecution of Stratton in Thurston County.[3]

■ A motion for a change of venue is directed to the sound discretion of the trial court and the court's decision

---

[2]Stratton told Hernandez that "he was 100 miles away when it happened"; that "he couldn't annihilate the whole town of Tacoma on account of my big mouth"; and that "Jim Hall," the bartender at the Yorktown, "was a lucky man because he was not behind the bar where he was supposed to be." In a later conversation concerning the Yorktown gunman, Stratton told her that "Andy [Anderson] had another clip with him."

Stratton told White that the shootings were to prove a point and that "John [Anderson] stood there and popped them off like he was on a shooting range"; that "Anderson was paranoid about my [White] having knowledge of what he had done, and he was afraid I was going to be in a position of telling on him"; and that "he [Stratton] and Phyllis and John [Anderson] had gone down to have lunch so John could case the layout of the place." White overheard Stratton tell Anderson, "he [Anderson] had impressed her, frightened her."

[3]Anderson was convicted of murder and multiple robbery counts in King County. See *State v. Anderson*, 31 Wn. App. 352, 641 P.2d 728, *review denied*, 97 Wn.2d 1020 (1982). Stratton was convicted of first degree murder for killing Jesse Hernandez. See *State v. Stratton*, unpublished opinion noted at 34 Wn. App. 1068 (1983).

on such a motion will not be disturbed "absent a convincing showing of an abuse of discretion." *State v. Stiltner,* 80 Wn.2d 47, 52, 491 P.2d 1043 (1971). Publicity alone does not justify a change of venue. To determine whether the trial court abused its discretion in denying the change of venue motion, it must be shown that there exists an apparent probability of prejudice to defendants' right to an impartial jury. *State v. Laureano,* 101 Wn.2d 745, 682 P.2d 889 (1984).

The record discloses a careful selection of each juror after independent voir dire. Some of the prospective jurors had read something about the incidents, but they could not remember details. Furthermore, the defense accepted the jury panel after calling only 32 prospective jurors and did not utilize all of their peremptory challenges. No prejudice was shown. A change of venue was not necessary.

## II
### SEARCH WARRANTS

Probable cause to support the issuance of a search warrant by a judicial officer under the Fourth Amendment is determined by a consideration of the "totality of the circumstances." *Illinois v. Gates,* 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983). Fourth Amendment decisions are applied retroactively to all cases pending at the time of the new decision. *United States v. Johnson,* 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579 (1982); *State v. Counts,* 99 Wn.2d 54, 659 P.2d 1087 (1983). Our Supreme Court has held that article 1, section 7 of the state constitution requires the dual determination of the basis of information and the credibility of the informant as pronounced in *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964) in evaluating the existence of probable cause based on an informant's tip. *State v. Jackson,* 102 Wn.2d 432, 688 P.2d 136 (1984). Retroactivity of *Jackson* was not argued to this court and there is no precedential decision declaring it to be retroactive.

It is not entirely settled whether *Illinois v. Gates, supra,* substantially changes the "two–pronged" analysis of *Aguilar/Spinelli.* Such inquiries are still considered useful along with all other factors in determining probable cause. *Illinois v. Gates, supra; State v. Bowers,* 36 Wn. App. 119, 672 P.2d 753 (1983). In any event, we are satisfied that under either test (assuming without deciding that the rule in *State v. Jackson* applies) there was probable cause to support the issuance of the warrant.

Defendants argued in support of their motions to suppress evidence obtained at the Federal Way residence that: (1) the search warrants were not issued on probable cause because White's information was "stale" and because White's having passed a polygraph test was erroneously relied upon to establish his credibility as an informant; and (2) the actual searches went beyond the scope of the search warrants. We do not agree.

■ Standing alone, the polygraph test is unlikely to vouch conclusively for White's credibility. Viewing the affidavits as a whole and in a nontechnical manner however, *State v. Hightower,* 36 Wn. App. 536, 544, 676 P.2d 1016 (1984), the touting of the informant as having passed a polygraph test should not presumptively invalidate the search warrants. Our concern with the prejudicial effect of polygraph tests during trials is not present when determining probable cause for a search warrant. Furthermore the other information within the affidavits was adequate to establish White's credibility.

■■ In the affidavits, White stated specific facts of the South China Doll crime and other crimes that were corroborated by eyewitness statements and by independent police investigation. Only a participant in the crimes with firsthand knowledge would have known such details. Information provided by the informant which is proven to be true and correct in the past is sufficient to establish credibility. *State v. Fisher,* 96 Wn.2d 962, 639 P.2d 743, *cert. denied,* 457 U.S. 1137 (1982); *State v. Johnson,* 17 Wn. App. 153, 561 P.2d 701 (1977) (police corroboration of the commission

of other burglaries admitted by the informants indicated that the informants were unlikely fabricating from whole cloth). The basis of knowledge requirement may be satisfied by the informant's statement of facts gleaned from firsthand information. 1 W. LaFave, *Search and Seizure* § 3.3(d) (1978). Here, White recited that he lived off and on with Stratton and Anderson at the residence to be searched; that he personally participated in various criminal activities with them; and described in some detail his personal knowledge of various weapons and clothing in Anderson's possession and the gun reloading equipment in Anderson's camper parked alongside the residence. This first affidavit was incorporated into the second and third affidavits together with information uncovered with the guidance of White and according to his knowledge of the residence and its contents. Based on the foregoing, White's credibility and basis of knowledge were clearly established. There was adequate information (if not "stale") under either the totality of the circumstances or the 2–step analysis of the informant's credibility and basis of his knowledge to issue the search warrants upon probable cause.

█ The facts supporting a search warrant must be current facts, not remote in time, and sufficient to justify a conclusion by the magistrate that the property sought is probably on the person or premises to be searched at the time the warrant is issued. *State v. Sainz*, 23 Wn. App. 532, 536, 596 P.2d 1090 (1979); *State v. Johnson*, 17 Wn. App. 153, 156, 561 P.2d 701 (1977) (information about possession of stolen property 4 months old held not too remote when facts indicate continuing possession). The test for "staleness" is one of common sense; if the facts indicate information is recent and contemporaneous, then it is not "stale." *State v. Riley*, 34 Wn. App. 529, 534, 663 P.2d 145 (1983).

Here, the facts stated in the affidavits indicate that approximately 2 months elapsed between White's arrest and serving the first search warrant. At the time White was arrested on January 27, 1980, Anderson was still in possession of the weapons, clothes, and tools used in the South

China Doll robbery–homicide 2 weeks earlier. Taking into account Anderson's ownership of a reloading apparatus and numerous firearms, together with his diligence in saving and reusing shell casings bearing a personalized red marking, it was probable that fruits of prior crimes were still in the residence at the time the warrant issued.

Finally, defendants contend the search of the commercial vacuum cleaner pursuant to the second warrant exceeded its stated scope of looking for clothes used in the robberies. For some unexplained reason, the search warrant itself is not in the record. Nevertheless, we find no error.

■ Whether a search exceeds the scope of a warrant depends upon a commonsense reading of the warrant. *State v. Patterson,* 37 Wn. App. 275, 280, 679 P.2d 416 (1984). Even if the second warrant here was limited to a search for clothes used in the robberies, as defendants claim, the warrant concededly extended to the entire residence where clothes might have been concealed. Clothing could easily have been concealed in a garbage can–sized commercial vacuum cleaner.

■ Furthermore, the crimes under investigation were robbery and homicide. The guns and weapon components discovered in the vacuum cleaner constituted probable instrumentalities of the crimes under investigation even though not specifically listed in the warrant. They were properly seized. *See State v. Turner,* 18 Wn. App. 727, 729–30, 571 P.2d 955 (1977), *review denied,* 90 Wn.2d 1024 (1978). *See also State v. Adame,* 37 Wn. App. 94, 100, 678 P.2d 1299 (1984), wherein the court held that contraband or stolen property discovered during a search for other specific items listed in a valid warrant may be seized under the plain view doctrine if the following criteria are met: (1) prior justification for intrusion; (2) incriminating evidence is discovered inadvertently; and (3) officers must know immediately that they have incriminating evidence before them. The criteria are met in the present case. The searches were proper.

## III
### POLYGRAPH EVIDENCE

Defendants contend the State's pursuit on redirect examination of witness Hernandez' testimony that she had taken a polygraph test substantially prejudiced their cases. We disagree. In reaching this result, a review of the trial record is necessary.

Mention of a polygraph examination first arose in an unresponsive answer by Hernandez during her direct examination. Further examination disclosed that though the subject was discussed she did not submit to a polygraph examination.

On cross examination the defense revived the subject of a polygraph examination by the following:

Q Now you mentioned in your direct examination that when you were dealing with the police that somewhere along the line you were asked to take a polygraph test?
A Yees [*sic*].
Q And that you did not take one?
A *Did not take one at that time.*

(Italics ours.) Neither the State nor the defense objected to this last statement. No motion to strike as unresponsive was made.

Finally, on redirect the prosecution pursued the following line of questioning:

Q Counsel asked about the polygraph test. What was your answer?
A I said I did not take one at that time.
Q Which time was that that you speak of?
A When the detectives from Thurston County first asked me to after the death of my husband.
Q While they were investigating the death of Jesse Hernandez, they asked you to come in and take the polygraph?
A Yes.
Q And you didn't do it?
A No.
Q Did you later?

MR. HORNE: I would like to object to that.

MR. CONNELLY: Counsel asked for this.

THE COURT: You may answer yes or no, and then that is it.

MR. CONNELLY: Q. When did you take it? You can answer when.

A During the trial in Thurston County.

Q Do you know, without answering the question, do you know what the results of that was?

MR. MURDACH: Objection, Your Honor.

THE COURT: I will sustain the objection. Don't answer.

Defendants moved for a mistrial or for cautionary instructions to the jury to disregard any mention of the polygraph testimony. The court denied the motion for mistrial and declined to "ad lib any instruction to the jury." The general rule in Washington is that polygraph examinations, especially the results therefrom, are inadmissible absent a stipulation of the parties. *State v. Rupe*, 101 Wn.2d 664, 690, 683 P.2d 571 (1984). Two reasons for the rule most often mentioned are that the test results tend to circumvent the jury's role in deciding credibility of a witness and that the reliability of the test is not firmly accepted by the scientific community.

■ Here, the defense invited the allegedly prejudicial response in its cross examination of Hernandez. After direct examination, the only stated fact concerning a lie detector test was that Hernandez did not take one. Since this fact actually hurt the State's case more than it helped, there was no prejudice. Only at the defense counsel's insistence did the fact surface that Hernandez did take a polygraph test at some time. Although her unresponsive answer was ripe for a motion to strike or for mistrial, neither was made. Further, taking into account the defendants' strategy in attacking Hernandez' veracity by citing instances where she lied to police about her husband's murder, and by utilizing her reluctance to take a polygraph test, the trial court did not err by allowing the prosecution to raise the limited

fact that she did later take a polygraph test.[4]

## IV

### EXPERT WITNESS TESTIMONY

Stratton argues that the evidence of ballistics tests and an analysis of the red substance on the bullet casings as chemically identical was speculative and incompetent, especially since the criminologist's use of a spectrophoto-meter to chemically compare the red markings was not proven to be reliable.

■ We need not address the merits of this argument because any error was not preserved for appeal. Defendants neither contested the qualifications of the criminologist as an expert, nor contested the use of the spectrophotometer to support the expert's testimony. It is a well recognized rule that errors raised for the first time on appeal may not be reviewed except in special circumstances, not applicable here. RAP 2.5(a); *State v. Rahier,* 37 Wn. App. 571, 575, 681 P.2d 1299 (1984).

Even if considered, there could be no error warranting reversal. Defendants' attack upon the expert's opinion as speculative goes to the weight of the evidence, not its admissibility. The defense had ample opportunity to refute the expert's opinion by cross examination.

## V

### OTHER OFFENSES AND ACTS OF MISCONDUCT

Stratton contests the admission of evidence concerning his prior conviction for the Hernandez contract murder in

---

[4]For similar results, see Annot., 15 A.L.R.4th 824 (1982). For example, in *State v. McDonough,* 350 A.2d 556 (Me. 1976), the court allowed the State to bring out on redirect the polygraph test, since the defense brought it out on cross examination to impeach credibility, not to prove the truthfulness of the results. In *State v. Hunt,* 297 N.C. 447, 255 S.E.2d 182 (1979), the court held that the defense cannot bring forward the polygraph information and then complain of its admission. Finally, in *Rollins v. State,* 154 Ga. App. 585, 269 S.E.2d 81 (1980), a state witness on cross inadvertently mentioned taking a lie detector test. The error was not prejudicial because the jury heard much impeachment evidence against the witness and the mention of the lie detector test did not affect the jury's evaluation of the witness.

Thurston County, his promotion of an insurance fraud scheme which never came to fruition, and his threat to kill a man named "Cowboy." Anderson contests the introduction of evidence surrounding the Casa Lupita and South China Doll crimes in King County. Both additionally contend the court failed to apply a balancing test on the record before admitting the evidence.

ER 404(b) provides:

**(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of prior crimes, wrongs, or acts will be admitted only if it satisfies two criteria. First, the evidence must be shown to be logically relevant to a material issue before the jury. *State v. Robtoy,* 98 Wn.2d 30, 42, 653 P.2d 284 (1982). In other words, the evidence must be relevant and necessary to prove an essential ingredient of the crime charged. *State v. Laureano,* 101 Wn.2d 745, 764, 682 P.2d 889 (1984). ER 404(b) applies to evidence of other crimes or acts regardless of whether they occurred before or after the conduct for which the defendant was actually charged. *State v. Laureano, supra.* Second, if the evidence is relevant its probative value must be shown to outweigh its potential for prejudice. *State v. Saltarelli,* 98 Wn.2d 358, 362, 655 P.2d 697 (1982). Without a balancing of the probative value against the prejudicial effect on the record, the evidence is not properly admitted. *State v. Tharp,* 96 Wn.2d 591, 592, 637 P.2d 961 (1981).

The admission or refusal of evidence of other crimes or acts lies within the sound discretion of the trial court, and that decision will be disturbed only upon a showing of abuse. *State v. Laureano, supra.* An abuse of discretion exists only when no reasonable person would take the position adopted by the trial court. *State v. Huelett,* 92 Wn.2d

967, 969, 603 P.2d 1258 (1979).

Addressing first the relevancy issue, Stratton's prior conviction for the Hernandez contract murder is relevant as the cornerstone of the "common criminal scheme" to frighten Hernandez by perpetrating the Yorktown slayings. It goes to the intent and motive behind the shootings and identifies Stratton. The insurance scheme and the reference to a threat upon "Cowboy" are a bit more tenuous. Arguably, the jewelry insurance scheme was a component of the larger purpose of threatening Hernandez to induce her to pay Stratton. Hence, it goes to motive and identity. The threat to "Cowboy," on the other hand, was unlikely to prove anything about the Yorktown episode except that Stratton's character was the type that could be involved.

Evidence from the Casa Lupita and South China Doll shootings, specifically the expended bullet casings, is relevant to show the identity of the Yorktown gunman. Anderson argues that this evidence was unnecessary because a comparison of the bullet casings retrieved from the Yorktown and those found at the residence alone could have connected Anderson. We disagree. The State correctly argues that comparison of the shell casings was twofold: (1) the red polish common to all the casings for reloading purposes; and (2) the breech marks imprinted on the casings by the slide of the .45 semi–automatic pistol. The shell casings found at the residence would not necessarily bear the same breech marks as those found at the other crime scenes. Additionally, White's testimony about the prior crimes, in which Anderson carried his black bag, ties directly in with Anderson leaving the house with his black bag on the evening of the Yorktown.

Relevancy is not enough to justify admission. The trial court must balance, on the record, the probative value of the evidence of other offenses against its prejudicial effect. The record need only reflect adequate consideration of the potential for prejudice in light of the probative value.[5]

---

[5]*State v. Jackson*, 102 Wn.2d 689, 689 P.2d 76 (1984), published after oral

From a careful review of the pretrial motions to exclude Stratton's Thurston County murder conviction and the Casa Lupita and South China Doll crimes, with extensive briefs on both sides, and the extended arguments and renewal of such motions and arguments during trial, we are satisfied that the record reflects full consideration of the value of the evidence and the potential for prejudice.

■■■ The introduction of the jewelry fraud scheme and the threat to "Cowboy" did not receive similar attention in the record, although the court heard argument from both sides. Even if we were to find an insufficient balancing in these later instances, and even if the reference to "Cowboy" is irrelevant, neither would have materially affected the outcome of the trial in light of the other evidence. *See State v. Thompson*, 95 Wn.2d 888, 632 P.2d 50 (1981). Any such error was harmless.

## VI
### COCONSPIRATOR'S EXTRAJUDICIAL STATEMENTS
### AS AN EXCEPTION TO HEARSAY
### ER 801(d)(2)(v)

Anderson challenges the introduction of the out–of–court statements made by Stratton to Joyce Hernandez and Larry White, and the conversation between Anderson and Stratton overheard by White which expressly implicate codefendant Anderson as the Yorktown gunman. See footnote 2 at page 92. He contends the statements were inadmissible hearsay and the Rules of Evidence creating an exception do not apply because: (1) the trial court did not

argument in this case, holds that the trial court must balance the prejudice against the relevancy of the other offenses and specifically state on the record the reasons why such evidence is admissible under ER 404. In arriving at this decision the court followed the rationale of *State v. Jones*, 101 Wn.2d 113, 677 P.2d 131 (1984), which requires the trial court to state on the record reasons for exercising its discretion favoring admission of a prior felony conviction for impeachment under ER 609(a)(1). However, in *State v. Rhoads*, 101 Wn.2d 529, 681 P.2d 841 (1984), the ruling in *Jones* was determined to be applied prospectively only because the ruling was a new procedural rule. Since *Jackson* pronounces a new procedural rule it too must be applied prospectively only.

find a prima facie conspiracy before admitting the declarations, and (2) the declarations were not in furtherance of the conspiracy.

ER 801(d)(2)(v), adopted verbatim from federal rule 801(d)(2)(e) provides:

**(d) Statements Which Are Not Hearsay.** A statement is not hearsay if—

. . .

(2) *Admission by Party–Opponent.* The statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Washington adheres to the principle that statements and acts of coconspirators are admissible, after the State has established a prima facie case, made out by evidence independent of the proposed hearsay, that the conspiracy existed at the time the statements were made, and upon at least slight evidence of defendants' participation. *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984); *State v. Culver,* 36 Wn. App. 524, 528, 675 P.2d 622 (1984); *State v. Miller,* 35 Wn. App. 567, 570, 668 P.2d 606, *review denied,* 100 Wn.2d 1032 (1983). The statement must be made during the course and in furtherance of the conspiracy. *State v. Culver, supra; accord, United States v. Hamilton,* 689 F.2d 1262 (6th Cir. 1982) (federal rule requires statement be made with intent to further the conspiracy, not that it actually furthered it), *cert. denied,* 459 U.S. 1117 (1983). The proof required to satisfy admission is that which, in the opinion of the trial court, establishes or tends to establish the fact of the conspiracy, *State v. Culver, supra,* and the determination whether a prima facie case exists is for the trial court in the exercise of its discretion. *State v. Langworthy,* 20 Wn. App. 822, 836, 583 P.2d 1231 (1978), *rev'd on other grounds,* 92 Wn.2d 148, 594 P.2d 908 (1979).[6]

---

[6]It is unnecessary that the coconspirator statement be made by the party against whom it is offered, or even that it be made in the party's presence. *United States v. Smith,* 623 F.2d 627 (9th Cir. 1980). Nor is it necessary that the defend-

Turning to the case before us, it is undisputed that Stratton's declarations were introduced at trial for the truth of the matter asserted, that is, to identify Anderson as the Yorktown gunman and describe the carnage that occurred. The State's theory is that the statements were made during the course and in furtherance of a "common criminal scheme," between Anderson and Stratton, to commit an act (Yorktown) so shocking that Hernandez would be terrified into keeping silent about Stratton's involvement in her husband's murder and to persuade her to keep paying Stratton.

We address first the argument that the trial court did not find a prima facie conspiracy before admitting the statements.[7] Prior to Hernandez testifying about the hearsay declarations, the court conducted a hearing outside the presence of the jury during which the court heard the hearsay and other evidence. Finding, on the record, a "common criminal scheme" amounting to a conspiracy in fact, the court admitted the statements. Likewise with White, the court heard the hearsay statements outside the jury's presence before admitting them into evidence.

■■ ■■ The trial court should not consider the hearsay statements themselves in determining whether a prima facie showing of conspiracy exists. However, prior to the admission of the challenged statements here, the court had in the record other sufficient independent evidence to substantiate a prima facie case.[8] The error if any was harm-

---

ant or the declarant be formally charged with conspiracy, *State v. Dictado*, 102 Wn.2d at 283; a joint venture amounting to a conspiracy in fact is sufficient. *United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981), *cert. denied*, 455 U.S. 1021 (1982).

[7]Anderson also argues that the court erred by not deleting reference to the hearsay statements in the prosecution's opening argument to the jury. We will not consider this issue because the State's opening argument is not in the verbatim record on appeal. This court has no way of knowing whether the statements complained of were made.

[8]The following facts were present in the record before the trial court admitted the hearsay: (1) Anderson and Stratton resided together at the relevant time; (2)

less. Finding the requisite conspiracy in fact does not alone justify admission, however. The declarations must also be during the course and in furtherance of the conspiracy. Stratton's statements to Hernandez were directed toward the ongoing purpose of the venture, that is, to frighten her. These fall within the coconspirator exception. Stratton's statements to White, on the other hand, were nothing more than casual, retrospective comments made in conversation about past events. *See United States v. Fielding*, 645 F.2d 719 (9th Cir. 1981). These do not fall within the coconspirator exception and are thus inadmissible hearsay declarations. The court erred in admitting Stratton's statements to White.

The erroneous admission of evidence of nonconstitutional magnitude is prejudicial only if within reasonable probability the outcome of the trial would have been materially affected. *State v. Kelly*, 102 Wn.2d 188, 685 P.2d 564 (1984). Here, the evidence, though circumstantial, marked Anderson as the gunman at the Yorktown shooting. He was of the same size and stature of the masked gunman and possessed clothing similar to that worn by the gunman. The same slide which fit Anderson's gun was used to discharge the several rounds at the Yorktown and was used when Anderson fired the weapon at the Casa Lupita restaurant. Another slide found at Anderson's residence was used by Anderson in the South China Doll homicide. The spent cartridges found at the Yorktown Restaurant bore red markings identical to those found at Anderson's residence,

---

in at least one other crime (South China Doll), Anderson, Stratton and White were participants; (3) bullet casings found at the Yorktown bore a similar red polish mark as casings found at the Federal Way residence and at other crimes in which Anderson discharged his .45 semi–automatic pistol; (4) Hernandez told Stratton that she talked to Jim Hall about Stratton's involvement in her husband's contract murder and about Stratton's plot to collect insurance money by having White steal Hernandez' jewelry; and (5) on the evening of the Yorktown, Anderson left the residence with a black bag, in which he normally carried handguns, gloves, ski mask, wig, and a hat, returning later in an agitated state and immediately listening to a police scanner; (6) Hernandez was shocked at the brutality of the Yorktown incident.

the Casa Lupita and the South China Doll restaurant. Such markings are commonly used by gun users who reload their cartridges so as to identify the cartridges as their own. Anderson had his own reloading equipment. Anderson was a close associate of Stratton who was attempting to silence Hernandez. Anderson, on the night of the Yorktown slayings was seen leaving his residence carrying the same black bag he used to carry weapons and items of clothing and returned in an agitated state shortly after the incident. Stratton's statement to Hernandez without specifically identifying Anderson as the gunman certainly implicated him.

The erroneous admission of Stratton's hearsay statements to White may not have been prejudicial under the nonconstitutional error test. However, we decline to so hold since this issue is closely intertwined with the improper denial of the motion for severance and requires a more stringent test as discussed below.

## VII
### MOTION TO SEVER

CrR 4.4(c)(1) reads:

**(c) Severance of Defendants.**
(1) A defendant's motion for severance on the ground that an out–of–court statement of a codefendant referring to him is inadmissible against him shall be granted unless:
(i) The prosecuting attorney elects not to offer the statement in the case in chief.
(ii) Deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

 Usually, the granting or denial of a motion for separate trial is entrusted to the trial court's discretion. *State v. Barry*, 25 Wn. App. 751, 756, 611 P.2d 1262 (1980). Separate trials are mandatory only in those cases falling under the umbrella of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968) and CrR 4.4(c)(1). *See State v. Grisby*, 97 Wn.2d 493, 506–07, 647 P.2d 6 (1982),

*cert. denied,* 459 U.S. 1211 (1983).

The *Bruton* decision does not extend to those instances where the extrajudicial statement against a codefendant falls within a "firmly rooted hearsay exception" (*i.e.,* coconspirator statement). *Accord, United States v. Rogers,* 652 F.2d 972 (10th Cir. 1981); *United States v. Kendricks,* 623 F.2d 1165 (6th Cir. 1980).

The trial court did not err by initially denying severance since it was alleged that the offenses charged were part of a common scheme or plan. CrR 4.3(b)(3). Further, because Stratton's statements to Hernandez satisfied the coconspirator exceptions to hearsay, the trial court did not err by denying severance on that basis. The court did err, however, by denying severance and admitting White's hearsay testimony. Since that statement did not fall within any hearsay exception, CrR 4.4(c)(1) is directly applicable. The State should have been put to an election either to delete Stratton's statements to White or to pursue separate trials.

CrR 4.4 was designed to implement the *Bruton* rule[9] which precludes use of inadmissible hearsay statements of a nontestifying codefendant as evidence when defendant's Sixth Amendment right to confront adverse witnesses is abridged. *State v. Wheeler,* 95 Wn.2d 799, 631 P.2d 376 (1981). A violation of the rule is subject to the constitutional harmless error test. Error is harmless only if we are convinced beyond a reasonable doubt that no prejudice has occurred. *State v. Wheeler, supra.* Two alternative analyses have been employed to determine whether constitutional error is harmless beyond a reasonable doubt. *State v. Johnson,* 100 Wn.2d 607, 621, 674 P.2d 145 (1983). One is described as the "contribution test" and the other as the "overwhelming evidence test".[10] Although Stratton's state-

---

[9]The *Bruton* doctrine was held applicable to the state in *Roberts v. Russell,* 392 U.S. 293, 20 L. Ed. 2d 1100, 88 S. Ct. 1921 (1968).

[10]Under the contribution test the error is harmless only if it can be said beyond a reasonable doubt that the tainted evidence did not contribute to the verdict. Under the overwhelming evidence test, the error is harmless whenever it

ment to Hernandez, which we hold was properly admitted, that "Andy had another clip with him" implicates Anderson as the gunman, Stratton's inadmissible statement to White that Anderson "stood there and popped them off like he was on a shooting range" and that Anderson had lunch earlier at the restaurant to "case" the place unquestionably identified Anderson as the gunman. Critical to Anderson's guilt was his identity as the gunman. The other evidence of identity, though adequate to overcome a challenge to the sufficiency of the evidence, was hardly overwhelming. Nor can we say that this evidence did not contribute to the jury's belief that he indeed was the gunman. Under these circumstances we cannot say that the denial of severance was harmless beyond a reasonable doubt.

## VIII
### PROSECUTORIAL MISCONDUCT

Stratton claims that three instances of prosecutorial misconduct require reversal. The first occurred during questioning of Hernandez about payments to Stratton, when the prosecutor stated, allegedly to Anderson's counsel: "[A]nd that is how part of the money got to your client." The second was the previously discussed questioning of Hernandez on redirect concerning a polygraph test. The third occurred when the prosecutor asked defense witness Jim Hall on recross examination, over objection, if he was afraid of the defendants.

The crucial question is whether, when viewed against the backdrop of all the evidence, there is a substantial likelihood that the prosecutor's misconduct affected the jury's verdict, thereby denying the defendants a fair trial. *State v. Davenport,* 100 Wn.2d 757, 762–63, 675 P.2d 1213 (1984); *State v. Hunter,* 35 Wn. App. 708, 669 P.2d 489, *review denied,* 100 Wn.2d 1030 (1983). The burden is

can be said beyond a reasonable doubt that the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *State v. Johnson,* 100 Wn.2d 607, 674 P.2d 145 (1983).

on the defendant to establish the impropriety of remarks made by the prosecutor and their prejudicial effect. *State v. Wilson,* 29 Wn. App. 895, 903, *review denied,* 96 Wn.2d 1022 (1981).

We would agree there is little, if any, justification for the prosecutor's question about the funds received from Hernandez. Nevertheless it can hardly be said that this comment affected the verdict in view of all the other evidence as well as the court's admonition to the jury. The court instructed the jury that comments of counsel were not to be considered as evidence, and the likelihood of this comment swaying the jury was slight in light of the other evidence. The reference to the polygraph test we have previously determined not to be error and the prosecutor's comments were not improper. Finally, it was proper for the prosecutor to ask Jim Hall if he was frightened of the defendants to show bias or interest, since Hall disputed the critical time frame of the conversation with Hernandez. *See* ER 607, 611(b); 5 K. Tegland, Wash. Prac. § 225 (2d ed. 1982); *State v. Roberts,* 25 Wn. App. 830, 611 P.2d 1297 (1980) (cross examination of a witness to elicit facts which tend to show bias, prejudice or interest is generally a matter of right, but the scope of such cross examination is within the discretion of the trial court). There is no abuse of discretion here. Defendants were not denied a fair trial by prosecutorial misconduct.

## IX
### LESSER INCLUDED OFFENSE INSTRUCTION

 Stratton excepted to the trial court's refusal to submit a lesser included offense instruction, yet neglected to submit to the trial court, or set out verbatim in his brief on appeal, the proposed lesser included offense instruction. Alleged error premised upon an inclusion or exclusion of a jury instruction will not be considered if the instruction is not set forth verbatim in the brief or appendix. RAP 10.4(c); *Thomas v. French,* 99 Wn.2d 95, 99, 659 P.2d 1097 (1983).

 Even if we were to consider defendant's contention, it lacks merit. To be entitled to a lesser included offense instruction, defendant must show: (1) that each of the elements of the lesser offense is a necessary element of the offense charged; and (2) that the evidence supports an inference that the lesser crime was committed. *State v. Hobart,* 34 Wn. App. 187, 191, 659 P.2d 557, *review denied,* 99 Wn.2d 1017 (1983). The facts support only one inference, that is, a premeditated intent to kill. A hooded gunman walked into the Yorktown, methodically fired eight rounds from a .45 semi-automatic pistol and left without a word spoken. Six patrons were shot, three of whom died. As to the wounded victims, the court did instruct the jury on second degree assault, but the jury found first degree assault. There is no error.

# X
## SENTENCING

Defendants' final contention concerns the constitutionality of imposing the penalty of life without possibility of parole, pursuant to former RCW 9A.32.040 and former RCW 10.94.[11] In light of *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981), which invalidated the death penalty portion of the above statutes but upheld the penalty of life without possibility of parole, the prosecutor timely filed a notice of intention to request the enhanced penalty of life without parole. After the verdict on the guilt phase of the trial, the jury was reconvened and found aggravating circumstances. Sentences of life imprisonment without possibility of parole were entered.

Anderson and Stratton contend their punishment violated the federal and state constitutions on the following grounds: (1) a great distinction exists between life with the

---

[11]Former RCW 9A.32.040 as amended by Laws of 1977, 1st Ex. Sess., ch. 206, § 3 was subsequently subjected to various amendments, a repeal and a reenactment. *See* Laws of 1981, ch. 136, § 55 and ch. 138, § 21 and Laws of 1982, ch. 10, §§ 2, 18. Former RCW 10.94 has been repealed, Laws of 1981, ch. 138, § 24(16). The capital punishment provisions are now embodied in RCW 10.95.

possibility of parole and life without the possibility of parole; this requires invalidation of life without parole under the rationale of *Frampton* because one charged with premeditated murder with aggravating circumstances feels undue pressure to forgo his right to trial by pleading guilty rather than face trial and be exposed to the possibility of the greater penalty; (2) the special sentencing procedure applies *only* when the death penalty has been requested— not, as here, when life imprisonment without parole is requested; (3) the special sentencing procedure was useless and its effect should be a nullity since the only possible issue in such a procedure once the death penalty is excluded is aggravating circumstances, which here was inherent in the jury's verdict of guilt to the multiple homicides; and (4) former RCW 10.94.020(5), which excludes from the special sentencing procedure evidence obtained in violation of the state and federal constitutions, wrongly denied Anderson any chance to rebut the State's evidence by calling Stratton because of Stratton's right to remain silent.

Former RCW 9A.32.040 provides three possible sentences in first degree murder cases. Pursuant to a special sentencing proceeding under former RCW 10.94.020, a death sentence verdict will result if the jury finds one or more aggravating circumstances without sufficient mitigating circumstances and makes other affirmative findings not pertinent here. A sentence of life without parole will result if the jury finds one or more aggravating circumstances but fails to find that there are insufficient mitigating circumstances or fails to make other findings not pertinent here. All other convictions for first degree murder shall be punished by life imprisonment. The jury may not, once it finds an aggravating circumstance, reduce life imprisonment without possibility of parole to simple life imprisonment by finding mitigating circumstances. *State v. Grisby,* 97 Wn.2d 493, 497–98, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211 (1983).

Defendants' first contention is squarely resolved to the

contrary in *State v. Frampton, supra.* While upholding its earlier decision invalidating the death penalty, *see State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980), the *Frampton* court upheld the constitutional validity of life without parole. Since *Frampton* is controlling, further analysis is unnecessary.

▮▮ As to defendants' second and third contentions, former RCW 10.94.900 provides:

> 10.94.900 Severability—1977 ex.s c 206. If any provision of this 1977 amendatory act, or its application to any person or circumstance is held invalid, the remainder of the act, or the application of the provision to other persons or circumstances is not affected.

The severability provision indicates that the punishment of life without parole may stand alone even though the death penalty provision has been declared unconstitutional. Given the unambiguous legislative intent, we must heed this directive. Further support is found in Justice Stafford's dissenting opinion in *State v. Frampton,* 95 Wn.2d at 513:

> As to the second issue, I agree with Justice Dimmick. The differences between life imprisonment with or without possibility of parole are not sufficiently great to be an impermissible encouragement of a defendant to plead guilty. Thus, this situation falls within the framework of *Corbitt v. New Jersey,* 439 U.S. 212, 58 L. Ed. 2d 466, 99 S. Ct. 492 (1978). I also see no impediment to prosecutors using the special sentencing procedure of RCW 10.94 to file a notice of intention to seek life imprisonment without possibility of parole, given the clear manifestation of legislative intent in both RCW 10.94.900 (severability) and RCW 9A.32.047 (penalty shall be life imprisonment without possibility of release or parole if death penalty is held unconstitutional).

It was not a useless act to submit the issue of aggravating circumstances to the jury. The court properly submitted the issue of enhanced punishment to the same jury to determine whether aggravating circumstances warranted life without parole. While it may be true that the original function of the special sentencing proceeding, that is, to weigh the aggravating circumstances against mitigating fac-

tors, is disrupted by a finding of aggravating circumstances which automatically results in the enhanced punishment irrespective of the mitigating factors, the statutes permit such a construction. *State v. Frampton, supra. State v. Grisby, supra,* supports this position.

Pursuant to the foregoing analysis, the jury at the sentencing proceeding need only find aggravating circumstances to set the punishment at life without parole. Here, the crimes the jury found defendants guilty of committing were in themselves aggravating circumstances.

Anderson's final challenge to the sentencing proceeding is without merit. He was not precluded from presenting exonerating evidence in rebuttal to the State's evidence. He was permitted to present any probative evidence even though such evidence might ordinarily be excluded by the rules of evidence. Such evidence might have included hearsay statements of Stratton and others which might have helped if indeed such statements were made. He was free to testify himself but he chose not to. The special sentencing proceedings were properly invoked and conducted.

For the reasons stated, we affirm Stratton's conviction and sentence but reverse Anderson's conviction and remand for a new trial consistent with this opinion.

WORSWICK, C.J., and REED, J., concur.