[No. 13690-2-II.   Division Two.   March 2, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. LYNN STANTON, *Appellant.*

*John P. Brody, Jr.,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Michael B. Savage, Deputy,* for respondent.

MORGAN, J. — Lynn Stanton appeals convictions for first degree theft and unlawful issuance of a bank check (UIBC). We reverse and remand.

In 1983, Stanton obtained a general contractor's license from the Department of Labor and Industries. On October 29, 1987, however, the license was suspended due to total impairment of his contractor's surety bond.

In September 1988, Stanton contracted with Carole Krivanek to build a sun room with an exercise pool for approximately $22,000. Stanton knew he was not licensed as a contractor at that time. Although he estimated he could finish the job in 4 to 6 weeks, he actually took 3 months. Krivanek paid him $23,702 for his work.

On September 27, 1988, Stanton contracted to purchase a swim spa from Spa World for Krivanek's sun room. The spa cost $8,624, and Stanton made a down payment of $1,000. He was to pay the balance upon delivery. Spa World is owned by Mike Petrowske.

Stanton and Petrowske disagree on the date the spa was delivered and the circumstances under which Stanton made payments for it. However, they agree that regardless of when the check was actually written, Stanton asked Petrowske not to cash it immediately.

According to Stanton, the spa was delivered on October 5 or 6, 1988, and he paid an additional $4,000 at that time. Petrowske told him not to worry about the balance yet, because some additional equipment remained to be delivered. Petrowske was to come get the check after the spa was "up and running", in part because Petrowske wanted to sell Krivanek a spa maintenance program at the same time. On November 30, 1988, Stanton wrote a check for the remaining $3,640, but he asked Petrowske not to cash it yet because there was not enough money in the bank to cover it.

Petrowske's version is that he received a check for $4,000 from Stanton around October 6 through 10, 1988, but the spa was not delivered until October 30, 1988. On October 30,

Stanton gave him a check for the remaining $3,624. However, Stanton postdated it to November 30, and Petrowske agreed not to cash it for 30 days. Petrowske called Stanton about the check during the first week in December. Stanton said he needed another 3 to 4 weeks, so Petrowske agreed to continue holding the check. Petrowske further states that he called Stanton a second time in early January 1989 to ask whether he could deposit the check, and Stanton told him the check was good. Stanton denies making the last statement.

In any event, Petrowske deposited the check in early January and it was returned for insufficient funds on January 5, 1989. He then presented the check a second time, but it was returned again for insufficient funds on January 11, 1989. In January, Stanton wrote 19 NSF checks, and his account eventually was closed because of too many such checks.

After the check failed to clear, Petrowske made numerous attempts to phone Stanton, but Stanton rarely, if ever, returned the calls. Subsequently, Petrowske's attorney persuaded Stanton to contact Petrowske, and the two of them agreed that Stanton would pay Petrowske $200 a month, do some carpentry work for him, and give him the titles to his two vehicles as collateral. Stanton then failed to make any payments or perform any carpentry work. He did turn over the vehicle titles, but neither he nor his wife signed them. Stanton's explanation for why he had not paid the balance of the contract was that his family "had to have a Christmas".

Eventually, Petrowske contacted the Kitsap County Prosecutor's office, and that office filed charges. A second amended information alleged one count of theft in the first degree, one count of unlawful issuance of a bank check, and one count of contracting without a license.

Prior to trial, Stanton stipulated to facts sufficient to support a conviction for contracting without a license. He also moved in limine to exclude evidence of other contract disputes. Two were prior and one was subsequent to dis-

putes being litigated. The State argued such evidence was admissible under ER 404(b) and the "doctrine of chances".

The first contract dispute involved a business called Evergreen Lumber, with whom Stanton had opened an account in late 1986 or early 1987. During the summer of 1987, the account became past due in the amount of approximately $6,500. All of that sum was due by August 10, 1987, and when Stanton failed to pay and failed to return phone calls, Evergreen recovered $6,000 by making a claim against his contractor's bond. It was this claim that impaired the bond and caused Stanton's contractor's license to be suspended.

The second contract dispute involved one Ahmet Chabuk, who had hired Stanton to do some carpentry work in the spring of 1987. The contract price was about $4,200. Stanton was to receive advances in accordance with a payment schedule. However, he repeatedly demanded unscheduled advances, and at one point stopped work for about a week. To induce him to finish the job, Chabuk wrote additional checks for about $1,000, but instead of finishing, Stanton again stopped work and removed his equipment from the jobsite. Chabuk stopped payment on the additional checks and, in the end, wound up paying about $3,900 for a job that was about three-quarters completed.

The third contract dispute involved a business called Harbor Pre-Fit Door, to whom Stanton became obligated for $3,091 in February 1989. When Stanton came to pick up certain materials, he did not bring a check and was unable to pay. Although Harbor's policy was that each customer pay for materials upon pickup, it allowed Stanton to take the materials in exchange for his promise to return and pay. He never did so, and Harbor filed suit.

The trial court denied Stanton's motion in limine. It admitted the Evergreen and Chabuk disputes on the following rationale:

> [T]he ultimate question the jury is going to have to wrestle with here is did Mr. Stanton get into financial difficulty after

he contracted with these two people, the home owner, Krivanek, and his supplier, Petrowske, or was he already in financial difficulty and his plan or scheme was to continue in business and collect money from new customers, get products from new suppliers and use the money that he gets in hand to pay those that were on his back from the past.[1]

The trial court admitted the Harbor Door dispute by saying, "[E]ven though it is subsequent, the State is entitled to use [it] to show there was a common scheme or plan involved in this entire serious [*sic*] of transactions."[2]

Ultimately, the jury convicted Stanton on all three counts: theft in the first degree, UIBC, and contracting without a license. Stanton then moved for arrest of judgment on grounds of insufficient evidence to prove count one, first degree theft, and count two, UIBC. He also moved for a new trial on grounds that evidence of other contract disputes was improperly admitted and that one of his proposed jury instructions was improperly denied. The trial court denied both motions.

Stanton now appeals his convictions for first degree theft and UIBC. He does not appeal his conviction for contracting without a license. He argues that the trial court erred in admitting evidence of other acts, in failing to give a proposed jury instruction, and in submitting the case to the jury.

I

EVIDENCE OF OTHER ACTS

Whether evidence of a defendant's other bad acts should be admitted at trial is governed by ER 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

---

[1]Report of Proceedings, at 30.

[2]Report of Proceedings, at 31.

■ Before evidence of other crimes, wrongs, or acts can be admitted over proper objection, the trial court must determine that it is logically relevant to a material issue before the jury and that its probative value outweighs its potential for prejudice. ER 401; ER 403; *State v. Kelly*, 102 Wn.2d 188, 198, 685 P.2d 564 (1984); *State v. Saltarelli*, 98 Wn.2d 358, 361-63, 655 P.2d 697 (1982); *State v. Robtoy*, 98 Wn.2d 30, 42, 653 P.2d 284 (1982); *State v. Clark*, 48 Wn. App. 850, 863, 743 P.2d 822, *review denied*, 109 Wn.2d 1015 (1987). In determining whether evidence is logically relevant, the trial court must find that it has a tendency to make more or less probable the existence of a fact that is of consequence to the action, ER 401; *Saltarelli*, 98 Wn.2d at 363; *see State v. Mutchler*, 53 Wn. App. 898, 901, 771 P.2d 1168, *review denied*, 113 Wn.2d 1002 (1989); *State v. Thompson*, 47 Wn. App. 1, 11, 733 P.2d 584, *review denied*, 108 Wn.2d 1014 (1987), and generally that such fact will be similar to those listed in ER 404(b). *Saltarelli*, 98 Wn.2d at 362; *see State v. Goebel*, 36 Wn.2d 367, 378-79, 218 P.2d 300 (1950). In weighing probative value against prejudicial effect, the trial court must exercise its discretion, and its decision will be overturned only for abuse of discretion. *Robtoy*, 98 Wn.2d at 42; *Thompson*, 47 Wn. App. at 12. However, "this balancing of probative value versus prejudice should be done on the record." *State v. Jackson*, 102 Wn.2d 689, 693, 689 P.2d 76 (1984); *see State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986); *State v. Tharp*, 96 Wn.2d 591, 597, 637 P.2d 961 (1981); *State v. Newton*, 42 Wn. App. 718, 725, 714 P.2d 684 (1986), *rev'd on other grounds*, 109 Wn.2d 69, 743 P.2d 254 (1987). Applying these principles to this case, we consider (a) the trial court's theory for admitting evidence of the Evergreen and Chabuk disputes, (b) the trial court's theory for admitting evidence of the Harbor Door dispute, (c) the State's theory for offering evidence of all three disputes, and (d) harmless error.

## A

We have no quarrel with the trial court's theory that evidence a contractor knows he is in financial trouble prior

to the date of a charged theft or UIBC will sometimes make more probable than otherwise, within the meaning of ER. 401, the fact that the contractor acted with criminal intent to deprive or defraud on the date of the charged theft or UIBC. In many prosecutions for theft or UIBC, including this one, it is necessary to focus on whether the defendant had an intent to deprive or defraud on the date of the charged crime. If on the date of the charged crime a defendant has knowledge that he cannot perform a promise he is then making, evidence of that fact has a "tendency" (ER 401) to make more probable than otherwise the fact that he acts with an intent to deprive or defraud.

As a matter of law, however, the trial court's theory does not support the admission of evidence concerning the Evergreen and Chabuk disputes.[3] According to the allegations in the second amended information, Stanton committed the charged theft and UIBC in October 1988 or later. At that time, at least $6,000 of the $6,500 owed to Evergreen had been paid by Stanton's bond. There is no evidence that at that time Stanton knew he would have to reimburse that amount, or that he knew anyone was seeking reimbursement from him. With regard to Evergreen, then, the evidence most favorable to the State is that Stanton knew he owed about $500 on the dates he was alleged to have committed theft and UIBC.

Likewise, Stanton performed about three-quarters of the Chabuk job, the price of which was about $4,200. There is no evidence that Stanton, on the date of the alleged theft and UIBC, knew that Chabuk would have to pay more than the job price to have someone else complete the work or, if Stanton knew that, how much the additional amount might be. With regard to Chabuk, then, the evidence most favorable to the State is that Stanton knew he had received

---

[3]The trial court did not purport to admit the Harbor Door dispute to show that Stanton knew he was in financial trouble at the time of the charged crimes. Because the Harbor Door dispute arose *after* the charged crimes, it could not have affected Stanton's knowledge of his financial condition at the time of the charged crimes.

$3,900 for a $4,200 job that had been three-quarters completed, or, in rough terms, that Stanton knew he might owe Chabuk about $750.[4]

Because the Evergreen and Chabuk disputes arose in mid-1987 and early 1987, respectively, and because they are not shown to have involved more than about $500 and $750, respectively, as of October 1988, evidence describing them had little, if any, probative value on the issue of whether Stanton thought he was in financial trouble in October 1988. On the other hand, evidence describing them had great potential to show that Stanton was generally a deadbeat who made promises, then failed to perform. That potential gave rise to a danger of unfair prejudice, and because probative value was so slight, that danger substantially outweighed probative value as a matter of law. ER 403.

### B

■■ We cannot agree with the trial court's theory that evidence of the Harbor Door dispute was admissible to show "common scheme or plan". "Common scheme or plan" is not an element of either first degree theft or UIBC. RCW 9A.56-.030(1); RCW 9A.56.020(1); RCW 9A.56.060(1).[5] As a result, it was not, by itself, a fact of consequence to this case. Assuming that the Harbor Door dispute tended to prove common scheme or plan, that tendency, without more, was not enough to show logical relevancy, and without logical relevancy, there was no probative value for purposes of ER 404(b). *See Saltarelli*, 98 Wn.2d at 362-63.

■ This result can also be explained by using more elaborate terms. A fact of consequence can be "ultimate", "intermediate" or "evidentiary". Fed. R. Evid. 401 advisory committee note; 56 F.R.D. 216 (1973). An "ultimate" fact is an element of the crime charged; an "intermediate" or "eviden-

---

[4]Three thousand nine hundred dollars actually paid, less $3,150 (three-quarters of $4,200) presumably earned by completing three-quarters of the job.

[5]Compare RCW 9A.56.060(3), in which common scheme or plan is an element. However, when common scheme or plan is an element, the evidence in issue will usually if not always involve *charged* as opposed to uncharged acts.

tiary" fact is one that is not an element, but which provides a basis from which to infer the existence of an element. *See* Fed. R. Evid. 401 advisory committee note.

Essentially, the trial court treated common scheme or plan as an ultimate fact, *i.e.*, as an element of the crime, when it said that evidence of Stanton's other disputes was admissible to prove "common scheme or plan". To that extent, it erred, for as noted already, common scheme or plan was not an element of either crime charged.

The trial court may have been attempting to treat common scheme or plan as an intermediate or evidentiary fact tending to support an inference of some element of the crime. If that were the case, however, the trial court failed to identify what element it thought common scheme or plan proved, and we see no possibilities except those discussed elsewhere in this opinion.

C

■ Although the trial court could not properly admit evidence of the three contract disputes on the theories it discussed on the record, we yet may affirm if the evidence was admissible for a different purpose. *Mutchler*, 53 Wn. App. at 903; *see Jackson*, 102 Wn.2d at 694. However, we cannot conclude that such evidence was properly admissible for another purpose unless the record on appeal is sufficient to allow us to engage in the balancing process that the trial court should have conducted. *See Mutchler*, 53 Wn. App. at 903; *State v. Bowen*, 48 Wn. App. 187, 191, 738 P.2d 316 (1987); *State v. Gogolin*, 45 Wn. App. 640, 645-46, 727 P.2d 683 (1986); *State v. Mahmood*, 45 Wn. App. 200, 212, 724 P.2d 1021, *review denied*, 107 Wn.2d 1002 (1986).

At trial, the State's basic argument was that evidence of the three other disputes was admissible to show that Stanton acted with criminal intent[6] when he dealt with Krivanek and Petrowske in late 1988. To analyze this argument, we initially view the Evergreen, Chabuk and Harbor disputes separately; then we view them in combination.

---

[6] *E.g.*, Report of Proceedings, at 20.

■ We assume without holding that if a defendant acts with criminal intent on an uncharged occasion, his or her intent on that occasion can sometimes serve as a basis for inferring the existence of similar intent on a charged occasion. However, an uncharged act must be proved by a preponderance of evidence before it can be admitted under ER 404(b); *State v. Bythrow*, 114 Wn.2d 713, 719, 790 P.2d 154 (1990); *Tharp*, 96 Wn.2d at 594, and it follows that the intent accompanying an uncharged act must also be proved by a preponderance where the existence of such intent is essential to admission of the act pursuant to ER 404(b). Here, the trial court did not find at all, much less by a preponderance of evidence, that Stanton acted with criminal intent when he dealt with Evergreen, Chabuk, or Harbor Door. We decline to make such findings, for even assuming that we could do so without going beyond our proper function, the record contains little to indicate that Stanton acted with criminal intent on those occasions. Because there is no finding that Stanton acted with criminal intent on any one of the Evergreen, Chabuk or Harbor occasions, none of those occasions, viewed separately, can serve as a basis for inferring criminal intent on the occasions involving Krivanek and Petrowske.

Even though no criminal intent is shown to have existed on any one of the occasions involving Evergreen, Chabuk or Harbor when those occasions are viewed separately, the State argues that criminal intent is shown to have existed on all three occasions when they are viewed in combination. To support this argument, the State relies on the "doctrine of chances", as described in *State v. Bowen*, 48 Wn. App. at 194, and *State v. Myers*, 49 Wn. App. 243, 248 n.4, 742 P.2d 180 (1987).

> "The doctrine of chances is based entirely on probabilities. Its foundation is the instinctive recognition that the odds against an innocent person being repeatedly involved in similar suspicious circumstances increase with each incident. At some point of recurrence, the similar repeated acts can no longer be viewed as coincidental. When the evidence reaches such a point, the recurrence of a similar unlawful act tends to negate accident, inadvertence, good faith, or other innocent

mental states, and tends to establish by negative inference the presence of criminal intent."

*Myers*, 49 Wn. App. at 248 n.4 (quoting Comment, *Admission of Evidence of other Misconduct in Washington To Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1225-26 (1986)).

Assuming without holding that the doctrine of chances is a valid concept for purposes of Washington's ER 404(b),[7] it cannot be applied here. Even when viewed in combination, the Evergreen, Chabuk and Harbor disputes do not give rise to an inference of criminal intent according to a preponderance of the evidence, and without such an inference, those disputes, even in combination, are not admissible under ER 404(b). *See Bythrow*, 114 Wn.2d at 719; *Tharp*, 96 Wn.2d at 594.

## D

■ The last step in our ER 404(b) analysis is to ascertain whether evidence of the Evergreen, Chabuk and Harbor transactions was harmless because it could not have affected the outcome of trial. A trial court's failure to weigh probative value against prejudice on the record is harmless error if the trial's outcome would have been the same without the admission of evidence concerning other bad acts. *Jackson*, 102 Wn.2d at 694-95; *see State v. Anderson*, 41 Wn. App. 85, 102, 702 P.2d 481 (1985), *rev'd on other grounds*, 107 Wn.2d 745, 733 P.2d 517 (1987). In this case, the State's overall evidence of criminality, as opposed to civil liability, was marginal, and it seems likely that the three transactions in issue would have had a significant impact on the jury. Under

---

[7]One Washington commentator has observed:

"The Washington courts have mentioned the doctrine of chances, but it is not entirely clear whether the courts regard the doctrine as a *separate* basis for admissibility under Rule 404(b). The Washington courts seem to regard the doctrine of chances as simply another way of describing admissibility to prove the absence of mistake or accident, or to prove intent." 5 K. Tegland, Wash. Prac., *Evidence* 429 (3d ed. 1989) (citing *Bowen* and *Myers*).

these circumstances, we cannot say that the outcome of the trial would have been the same if the three transactions had been excluded, and thus reversal is required.

## II
### SUFFICIENCY OF THE EVIDENCE

■ Stanton claims that the evidence was insufficient to support the verdicts. We consider that claim because it affects the remedy applicable to the evidentiary errors we have just discussed. If the evidence, including that erroneously admitted, *Lockhart v. Nelson*, 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285 (1988), was insufficient as a matter of law, the double jeopardy clause entitles Stanton to dismissal with prejudice. *Burks v. United States*, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141 (1978). Otherwise, he is entitled only to a new trial.

Evidence is sufficient when any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 223-24, 616 P.2d 628 (1980); *Jackson v. Virginia*, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). Even though the evidence at the first trial was marginal, we hold that it was sufficient to meet this test.

## III
### JURY INSTRUCTION

Stanton claims that the trial court erred by omitting one of his proposed jury instructions. We consider this claim because it is likely to arise again at the time of new trial.

Stanton was charged with first degree theft as follows:

> He, the said LYNN STANTON, in the County of Kitsap, State of Washington, on or about or during the period from November 1, 1988 through July 1, 1989, did wrongfully obtain or exert unauthorized control over the property or services of another and/or by color or aid of deception, did obtain control over the property or services of another, to-wit: a spa tub belonging to Spa World of Bremerton . . . with intent to deprive said person of said property, said property being in excess of one thousand five hundred dollars ($1,500.00) in value . . .[.]

At trial, however, the court submitted only theft by deception to the jury. Thus, only theft by deception is in issue insofar as jury instructions are concerned.

At the close of the trial, Stanton submitted proposed jury instruction 4. Based on RCW 9A.56.020(2) and WPIC 19.08, it stated:

> It is a defense to a charge of theft that the property or service was appropriated openly and avowedly under a good faith claim of title, even though the claim be untenable.

The trial court refused to give this instruction, and Stanton assigns error to that ruling.

■ The trial court was not required to give the proposed instruction where the charge was theft by deception. Before the jury can convict on such a charge, it must find that the defendant obtained control over the property of another "by color or aid of deception". RCW 9A.56.020(1)(b). Such a finding necessarily includes an implied finding that the defendant did *not* obtain control over the property "openly and avowedly under a good faith claim of title". The jury need not consider the same finding a second time, and, thus, the court need not instruct on the defense of good faith claim of title.

We have adapted this reasoning from *State v. Emerson*, 43 Wn.2d 5, 12, 259 P.2d 406 (1953), which dealt with the statutory predecessor of RCW 9A.56.020(1)(b), larceny by false pretenses. The *Emerson* court said:

> A false representation of a material fact, made for the purpose of inducing another to part with his property and with the intent to deprive him of his property, is inconsistent with any open and avowed claim of title preferred in good faith; and the defense allowed by the statute is unavailable in a prosecution for obtaining money by false pretenses.

Thus, we conclude that the trial court did not err when it refused to give Stanton's proposed jury instruction 4.

Reversed and remanded for further proceedings.

ALEXANDER, C.J., and PETRICH, J., concur.