546 A.2d 42

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Stanley PERKINS, Appellee.**

Supreme Court of Pennsylvania.

Argued March 9, 1988.

Decided Aug. 12, 1988.

Edward J. Tocci, Dist. Atty., Ahmed T. Aziz, Asst. Dist. Atty., Beaver, for appellant.

John P. Dohanich, Robert A. Banks, Ambridge, for appellee.

## ORDER

PER CURIAM:

The Court being evenly divided, the decision of the Superior Court is affirmed.

ZAPPALA, J., did not participate in the consideration or the decision of this case.

STOUT, J., files an opinion in support of affirmance in which NIX, C.J., and FLAHERTY, J., join.

LARSEN, J., files an opinion in support of reversal in which McDERMOTT and PAPADAKOS, JJ., join.

## OPINION IN SUPPORT OF AFFIRMANCE

STOUT, Justice.

This is an appeal by the Commonwealth from the Order of the Superior Court vacating the judgment of sentence of the Court of Common Pleas and remanding for a new trial, 358 Pa.Super. 626, 514 A.2d 199. We affirm.

Appellee was convicted of burglary and rape. The eighteen-year-old victim was raped at about 2:30 or 3:00 a.m., June 28, 1983, in her home on Main Street in Aliquippa, Pennsylvania. She said the rapist was a black man, about twenty-five years of age, who was muscular but not heavy. He had short hair and carried a small gun which protruded about an inch or an inch-and-a-half over his finger. He instructed the victim not to make any noise on pain of death. Because the rapist held a blinding flashlight to her face, the victim could not identify him.

After the rape, which occurred in a back, first-floor room, the rapist directed the victim to the living room. There he inquired as to where her mother was, whether there was a dog on the premises, and where her mother's purse and jewelry were kept.

After this conversation, the victim, who no longer saw the gun, ran screaming from the living room to her brother's home across the street. The rapist ran out behind her but did not cross the street.

The victim's mother, who was awakened by the screams, ran downstairs and saw a black man running down her front steps. She said the person, who turned his head towards her, had a wide nose. From a distance of some fifteen feet, she noticed that he was wearing a light, short-sleeved summer shirt that was open at the collar, dark pants, either gray or brown, and not jeans. His feet were clad either in white socks or shoes. She could not identify Appellee either in court or from a photographic array.

Two gold rings were missing from the victim's house.

Stephen Novosalec, who lives a half-block away and across the street from the victim, arose about 2:30 a.m.,

June 29, 1983 to prepare for a fishing trip. As he was about to step onto his porch, he heard a scream coming from the direction of the victim's house. On looking out, he saw one person screaming and running across the street, and saw another person running down the sidewalk on the other side of the street. This person was a male about six feet tall. He had on jogging pants, a brown and white tasseled cap, a light windbreaker and light shoes. Mr. Novosalec did not see the runner's face and could not identify Appellee.

Over the objection of defense counsel, Nick Kosanovich, who lives two blocks from the victim's home, testified that he was finishing a shower about 7:00 or 7:30 a.m., June 29, 1983, when he heard banging on his cellar door and then heard it open. He pulled back the shower curtain and, for ten to fifteen seconds, observed Appellee in front of him. He was clad in a ragged, off-colored shirt and red, cut-off sweat pants. Mr. Kosanovich saw no gun. He yelled. Appellee ran. Mr. Kosanovich called the police. Between twenty and thirty officers from Aliquippa and two surrounding townships responded and surrounded the wooded areas which were near the homes of Kosanovich and the rape victim and all exits from the wooded areas by which they felt the suspect might flee. While Appellee was in the bed of a creek that runs through the woods, he was shot and apprehended.

█ Although Appellee was being tried for the earlier burglary and rape and not for the entry into the Kosanovich home, the learned Trial Judge admitted the testimony of Mr. Kosanovich "to establish identification of the person presently on trial and also to show a common scheme or plan and to show intent." N.T., April 10, 1984, at 201. This was error.

The law of this Commonwealth is summarized in *Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715, 720 (1981) where it is written that:

It is a principle of long standing in this Commonwealth that evidence of a distinct crime, except under special

circumstances, is inadmissible against a defendant who is being tried for another crime because the commission of one crime is not proof of the commission of another, and the effect of such evidence is to create prejudice against the defendant in the jury's mind.... The general rule, however, allows evidence of other crimes to be introduced to prove ... (2) intent ... (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

Intent is not an issue in this case. A breaking and entering followed by a rape proclaims *mens rea,* and is without ambiguity. The identity of the actor is at issue here and the Commonwealth sought to prove it through evidence of common scheme, plan or design. That evidence is inadequate.

Before one crime can be said to have a logical connection to another, the two must be more than generic in character. Text writers are in accord. McCormick has written that to fall within the exception to the general rule, the pattern and characteristics of the other crimes "must be so unusual and distinctive as to be like a signature." [1] Wigmore has written that:

> [W]here the conduct offered consists merely in the doing of other similar acts ... something more is required than that mere similarity, which suffices for evidencing intent.....

The added element ... must be not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as*

1. C. McCormick, *Evidence* § 190, at 560 (3d ed. 1984).

*caused by a general plan of which they are the individual manifestations.*[2]

▪ Imwinkelried has written that before uncharged misconduct evidence may be used to establish identity, both crimes must have been committed with the same or strikingly similar methodology and the methodology must be so unique that both crimes can be attributed to one criminal. In determining whether there is a sufficient degree of similarity between the charged and the uncharged crimes, one must look to three factors: (1) the time lapse between the two crimes, (2) the geographic distance between the two crimes, and (3) the resemblances between the methodologies of the two crimes.

▪ Proof of the similarity of two crimes is insufficient to justify admitting the uncharged misconduct to prove the defendant's identity. Before evidence to prove the identity may be admitted, the methodology must be unique.[3]

In this case, neither the time lapse between the two crimes nor the geographic distance between them prohibited the introduction of evidence of the uncharged crime, however, the dissimilarity of methodology did. *Compare Commonwealth v. Bryant,* 515 Pa. 473, 530 A.2d 83 (1987), where the circumstances surrounding the two crimes were not sufficiently similar as to render admissible the evidence of the defendant's role in the crime for which he was not being tried, *with Commonwealth v. Wable,* 382 Pa. 80, 114 A.2d 334 (1955), where the Court found that there was such a concatenation of circumstances and such an uncanny similarity in all the details of the perpetration of the crimes

---

**2.** J. Wigmore, *Evidence* § 304, at 249 (Chadbourn 1979).

**3.** E. Imwinkelried, *Uncharged Misconduct Evidence* §§ 3:10–3:12 (1984).

The courts and commentators have used various expressions to describe the requirement that the methodology be attributable to only one criminal: The methodology must be 'bizarre,' 'highly characteristic,' 'distinguishing,' 'distinctive,' 'dramatic(ally) similar,' an 'earmark,' 'exceptional,' a 'fingerprint,' a 'handiwork,' 'identifying,' 'idiosyncratic,' 'novel,' 'parallel,' 'peculiar,' 'remarkably similar,' 'set apart,' 'signature quality,' 'singular,' 'strikingly similar,' 'a veritable trademark,' 'uncommon,' 'unique,' or 'unusual.' *Id.* Sec. 3:12.

that a clearer example of crimes committed in the course of a common scheme, plan or design would be difficult to conceive.[4]

The Trial Court also ruled that the Kosanovich testimony was admissible as it tended to show that when Appellee entered his residence he was acting in the course of his intention to "do some jobs," as he stated to an interrogating officer, or that it showed an attempt to escape from the crimes he had committed on Main Street, and that it "completed the story" by proving the full nature of the events. The Trial Judge relied on *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975), *Commonwealth v. Taylor*, 299 Pa.Super. 113, 445 A.2d 174 (1982), and *Commonwealth v. Stevens*, 237 Pa.Super. 457, 352 A.2d 509 (1975), none of which is apposite.

The admission of the Kosanovich recitation of Appellee's commission of an unrelated crime, totally generic in character, and void of any unique or strikingly similar methodology was impermissible.

The Order of the Superior Court is affirmed.

NIX, C.J., and FLAHERTY, J., join in this opinion.

## OPINION IN SUPPORT OF REVERSAL

LARSEN, Justice.

The evidence regarding appellee Stanley Perkins' breaking and entering the home of Nicholas Kosanovich was a vital link in the Commonwealth's chain of evidence establishing beyond a reasonable doubt appellee's identity as the

---

4. In *Wable*, within a six-day period, two truckers were killed and a third trucker was injured while sleeping in the cabs of their trucks on or near the Pennsylvania Turnpike in the early morning hours of July 25, 28, and 31, 1953. Each was shot by a single bullet which was fired from the same gun at about the same angle. *Accord, Williams v. State*, 251 Ga. 749, 312 S.E.2d 40, (1984), where testimony regarding ten uncharged homicides was admitted and evidence used to connect the defendant to those crimes consisted of comparisons of fibers and hairs discovered on the victim's clothing and bodies, and on items used in the recovery of their bodies with fibers and hairs removed from Williams, his home and cars, and his German shepard dog.

rapist of the victim in this case and the burglar of her home, and the determination that the probative value of this evidence of other crimes outweighed any prejudice to appellee was well within the trial court's discretion. The Superior Court erred, therefore, in reversing the trial court.

The standards governing the introduction of evidence of distinct criminal acts attributed to the defendant are well-established. In *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988), this Court recently reviewed those standards. Evidence of distinct crimes is not admissible against a defendant being prosecuted for another crime to show his bad character and/or his propensity for committing criminal acts. *Commonwealth v. Banks*, 513 Pa. 318, 349, 521 A.2d 1 (1987); *Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715, 720 (1981). However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). As we recently stated in *Banks:*

> [T]he general rule prohibiting the admission of evidence of prior crimes nevertheless
>
> > allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.
>
> *Commonwealth v. Morris, supra* at 493 Pa. 175, 425 A.2d 715. This list of "special circumstances" is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to

prejudice the jury. *Commonwealth v. Claypool, supra*
. . . .

513 Pa. at 350, 521 A.2d at 17. Another "special circumstance" where evidence of other crimes may be relevant and
admissible is where such evidence was part of the chain or
sequence of evehts which became part of the history of the
case and formed part of the natural development of the
facts. *Commonwealth v. Brown*, 462 Pa. 578, 591, 342
A.2d 84, 90 (1975); *Commonwealth v. Murphy*, 346 Pa.Super. 438, 443, 499 A.2d 1080, 1082 (1985), quoting *Commonwealth v. Williams*, 307 Pa. 134, 148, 160 A. 602, 607 (1932).
This special circumstance, sometimes referred to as the "res
gestae" exception to the general proscription against evidence of other crimes, is also known as the "complete
story" rationale, *i.e.*, evidence of other criminal acts is
admissible "to complete the story of the crime on trial by
proving its immediate context of happenings near in time
and place." *Commonwealth v. Lark*, 518 Pa. at 303, 543
A.2d at 497 (citations omitted).

It is equally well-established that evidentiary issues such
as these, regarding the admissibility of evidence of distinct
crimes, are addressed to the sound discretion of the trial
court and are not to be reversed on appeal absent an abuse
of that discretion. *Commonwealth v. Banks, supra*, 513
Pa. at 350, 521 A.2d at 17.

With these standards in mind, a review of the facts and
circumstances of record clearly indicates that the trial court
did not abuse its discretion in admitting testimony that
appellee had broken into the home of Nicholas Kosanovich
some three and one-half hours after an intruder had raped
the victim in this case and burglarized her home. That
record discloses the following.

At about 3:30 a.m. on June 28, 1983, the eighteen year old
victim was awakened in her home by a black man with short
hair shining a flashlight in her face, who held a small gun
to her face, and threatened to kill her if she did not have
intercourse with him. The intruder then raped her, following which he asked where her mother kept her purse and

jewelry. Eventually, the victim managed to escape, and her assailant fled. The victim's mother and a neighbor saw the intruder flee the victim's home. The neighbor described the man as wearing, inter alia, jogging pants and a light blue windbreaker. Two gold rings had been taken from the home.

Aliquippa Police were summoned to the scene and began to search for the rapist/burglar. Additional police officers from neighboring municipalities joined the search, and as twenty to thirty officers combed the area, several sightings of a man running through the neighborhood were reported over the next several hours.

At about 7:00 a.m., neighbor Nicholas Kosanovich, in his home about two blocks away from the victim's home, was taking a shower in his basement when an intruder broke into the basement. Mr. Kosanovich positively identified appellee, a black male matching the general description of the rapist who was wearing red sweatpants and an off-colored shirt, as the man who broke into his home, and who fled into the adjacent wooded area when he (Kosanovich) yelled at appellee.

About one hour later, appellee was wounded and apprehended in that wooded area. With him was a set of keys to his car which was parked only eight doors from the rape/burglary victim's home. In the fall of 1983, important evidence was discovered in the woods approximately one hundred yards from where appellee was apprehended. This evidence consisted of a .25 caliber hand gun which the rape victim testified was similar to the gun held by her assailant, a small tool box containing a variety of tools such as screwdrivers, a wire cutter and a flashlight, and a light weight blue jacket.

While in Allegheny General Hospital receiving emergency treatment, appellee voluntarily told Aliquippa police officers that he came to the neighborhood to "do some jobs," but denied that he had raped anyone. In his brief, appellee concedes that "do some jobs" meant "commit some burglaries." Brief for appellee at 2.

Finally, a forensic chemist testified for the Commonwealth that, based on serology analysis of blood, semen, saliva and other bodily fluid samples taken from appellee and the rape victim, the rapist was a "Type B secretor," a certain blood type which constitutes 14.4% of the black population. Appellee is a "Type B secretor."

The trial court weighed the probative value of the evidence of appellee's breaking and entering Mr. Kosanovich's home against its likely prejudice to appellee (in showing him to be a person with a criminal propensity), and decided, in its discretion, to admit that evidence. The court also considered the Commonwealth's offer of proof that it would establish that several other neighborhood homes had been broken into on the morning of June 28, 1983, balanced the probative value of that evidence against potential undue prejudice to appellee, and ruled that this evidence of additional burglaries and/or attempts (i.e., other than the Kosanovich breaking and entering) could not be introduced.

The trial court did not abuse its discretion with either of these evidentiary rulings, and it conscientiously balanced the competing interests of the Commonwealth and the accused, accommodated the needs of justice, and admitted the most highly probative evidence of the breaking and entering while excluding that evidence of other burglaries or attempts which the court deemed of insufficient probative value to outweigh the potential for prejudice. The Superior Court erred, therefore, in overturning the trial court which did not abuse its discretion in admitting the challenged evidence.

Under all of these unusual circumstances, the breaking and entering of Mr. Kosanovich's home was a vital evidentiary link in the Commonwealth's chain of evidence which proved that appellee was the assailant of the rape/burglary victim earlier that morning. First, appellee matched the general description of the rapist. Second, the rapist also burglarized that victim's home. Third, he displayed and threatened her with a small caliber gun. Fourth, appellee's car was found after his arrest, only eight doors from the rape victim's home. Fifth, appellee broke into a house only

two blocks away from his rape victim's home, some three and one half hours later. Sixth, sightings from various residents in the neighborhood indicated that the rapist was still in the vicinity in the period between the rape and appellee's arrest. Seventh, when appellee fled Mr. Kosanovich's home, he ran to the adjacent woods where he was subsequently shot and captured. Eighth, several months subsequent to these events, within one hundred yards of the place of apprehension, a burglary tool box, a light weight blue jacket and a small caliber gun which the rape victim identified as being similar to the one used by her assailant were found. Ninth, after his apprehension while in a local hospital, appellee admitted to the police that he was in the neighborhood to "do some jobs," i.e., commit some burglaries. Tenth, appellee's blood type put him in a class of 14.4% of the black population who might have been the rapist.

From all of the foregoing, a strong inference is raised that the rapist was the same man who broke into Mr. Kosanovich's home. It strains credulity to suggest that there may have been another black man matching appellee's general description and clothing in the same 14.4% class of "Type B secretors" who pulled another "job" two blocks away some three and one-half hours earlier. The cumulative effect of the various pieces of circumstantial evidence, considered with all reasonable inferences and conclusions drawn from that evidence, narrows the class of possible rapists to appellee. A critical link in this chain of circumstantial evidence is forged by the inference and logical conclusion that the first victim's rapist/burglar remained in the neighborhood despite (or perhaps because of) the extensive police search, and that two blocks away several hours later, appellee was positively identified as breaking into a neighbor's home, presumably either to rob it or to hide from the police.

If appellee was *not* the same person who attacked the rape victim and robbed her home, but was merely and coincidentally another burglar with "unfortunate timing," would he just "happen" to have parked near the rape

victim's home and then have chosen to rob a nearby house in a neighborhood being combed by twenty to thirty police officers? It is much more plausible and probable that the "two" criminals were one and the same. I reject out-of-hand the "unfortunate coincidence" theory, as did the trial court and the jury.

In *Commonwealth v. Travaglia,* 502 Pa. 474, 493–494, 467 A.2d 288, 297–98 (1983), cert. denied 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984), highly prejudicial evidence of a prior abduction and murder, one murder in Travaglia's and co-defendant Lesko's "kill for thrill" murder spree, was allowed to be introduced in their trial for murdering a police officer. We held that such evidence was necessary to show motive and intent, and to rebut the defense that the killing of the police officer was accidental, stating that the facts of the prior abduction and murder are "so heavily related to and intertwined with the circumstances of [the officer's] killing that their evidentiary value greatly outweighs any possible prejudice suffered by the Appellants.... Where facts are relevant for a proper purpose at trial, defendants may not be heard to complain about the horrid character of such facts." *Id.,* 502 Pa. at 494, 467 A.2d at 297–98.

Similarly, in *Commonwealth v. Lark, supra,* this Court unanimously ruled that the trial court did not err in admitting in Lark's homicide trial evidence of distinct crimes of terroristic threats, robbery and kidnapping under the unusual circumstances there presented, stating:

> In the instant case, the evidence of each of the offenses —murder, terroristic threats, and kidnapping—would have been admissible in a separate trial for the others. Each of these offenses were interwoven in a tangled web of threats, intimidation and criminal activity which arose from the robbery in 1978 of [the murder victim] Tae Bong Cho, and were relevant to prove motive, intent, identity (such a logical connection between the crimes that proof of one naturally tends to show that the accused committed the other), and to "complete the story" by demonstrating the history and natural development of the facts.

\* \* \* \* \* \*

The terroristic threats ... and the kidnapping ... were clearly relevant to shed light on appellant's motive and intent in murdering Mr. Cho, in establishing his identity by showing a logical connection between the crimes and a common and off-repeated pattern of the appellant, and, importantly in this unique case, to show the natural development of the case and to complete the story. Indeed, the events described at trial were interwoven with and naturally developed one from the other, and the evidence of each of the offenses would have been admissible in a separate trial for the other.

\* \* \* \* \* \*

Not surprisingly, criminal defendants always wish to excise evidence of unpleasant and unpalatable circumstances surrounding a criminal offense from the Commonwealth's presentation at trial. Of course, the courts must make sure that evidence of such circumstances have some relevance to the case and are not offered solely to inflame the jury or arouse prejudice against the defendant. The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged, as appellant would have preferred.

518 Pa. at 304, 307, 310, 543 A.2d at 501, 497–498, 499, 500–501.

As in *Lark*, the evidence of appellee's breaking and entering Mr. Kosanovich's home was highly relevant in the prosecution for the earlier rape and burglary of his previous victim because, in conjunction with other circumstantial evidence, it established the rapist's identity by showing a logical and natural connection between the crimes, a common *and admitted* pattern (that he was in the neighborhood to do "some jobs," which he certainly did do), and to show the natural development of the facts and to complete the story. The trial court did not abuse its discretion, therefore, in its well-reasoned determination that the probative value of the evidence of this distinct crime greatly outweighed any potential prejudice.

The members of this Court in support of affirmance and the Superior Court seem to have been distracted by a "red herring" thrown at us by appellee. The majority holds that "before uncharged misconduct evidence may be used to establish identity, both crimes must have been committed with the same or strikingly similar methodology and the methodology must be so unique that both crimes can be attributed to one criminal," i.e., both crimes must be "signature crimes." At 154. This is a red herring because we are not dealing with nor should we be distracted by the so-called "signature crimes" exception in the instant case.

A "signature crime" is offered as evidence that the perpetrator committed the crime for which he is on trial merely because the modus operandi is so unique and similar that the crimes must have been committed by the same person, and is admissible solely because of the strong inference arising from such a unique modus operandi being used on more than one occasion. As we have seen time and time again, however, "signature crimes" are not the only exception to the general proscription against evidence of other crimes, nor is the "same perpetrator" inference arising with "signature crimes" the only way in which a logical connection between crimes may be established to, in turn, establish identity. For example, if a person robbed a house and dropped a knife there, that evidence would plainly be admissible in his trial for murder of an unrelated victim if that knife was shown to be the murder weapon, not because the crimes were "signature crimes" but because there was such a logical connection between the crimes that proof of the identity of the robber who possessed the murder weapon would naturally tend to establish his identity as the murderer.

Robert Lark's assortment of separate and distinct crimes, namely robbery, murder, terroristic threats and kidnapping, were not admissible as evidence each for the other because they were "signature crimes" committed by means of some unique modus operandi, and the Commonwealth made no such offer of proof. Rather, evidence of the separate and

distinct crimes were admitted as evidence each for the other because, under the circumstances, each formed an integral part of the natural development of the complete criminal scenario and were logically connected to each other. Likewise in the instant case, the evidence of the breaking and entering was neither offered nor admitted because the modus operandi was so unique and similar to that employed in the earlier rape/burglary that the same person must have been responsible for both. As in Lark, the breaking and entering had a logical connection to the earlier rape/burglary under all of the circumstances, was part of the natural development of the facts, completed the story of the events of June 28, 1983, and was an integral component of the Commonwealth's case.

I would accordingly reverse the Superior Court and remand to that court for disposition of appellee's remaining appellate issues.

McDERMOTT and PAPADAKOS, JJ., join in this opinion in support of reversal.