[No. 14604-5-II. Division Two. February 16, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY KENNETH HERZOG, *Appellant*.

Robert A. *Lewis* and *Knapp, O'Dell & Lewis,* for appellant (appointed counsel for appeal).

Arthur D. *Curtis, Prosecuting Attorney,* and *Mark E. Beam, Deputy,* for respondent. [As amended by order of the Court of Appeals March 25, 1994.]

MORGAN, C.J. — Gary Kenneth Herzog appeals convictions for first degree kidnapping, first degree rape, attempted first degree kidnapping, and second degree assault. We affirm.

At about 9 p.m. on March 16, 1989, a man grabbed S, a 12-year-old girl, while she was walking on the street in

Vancouver. He forced her into a nearby pickup truck, the bed of which was covered by a canopy. He drove away with her sitting on the floor of the cab. He made her remove her clothing as they drove. After awhile, he stopped at an isolated location and forced her into the back of the truck, under the canopy. He partly covered her head with a towel, then raped her repeatedly. During this time, he told her he was putting cocaine in her vagina. After the rapes, he drove back to Vancouver, where he released her.

S immediately reported the attack to the police. She described the attacker as a white male, 30 to 40 years old, 5 feet 10 inches to 6 feet tall, short blonde hair, mustache, with a muscular build. She described a scar on his stomach and a 2-heart tattoo on his left arm. She said he smoked cigarettes, and that he was wearing a short-sleeve shirt, blue jeans, and brown cowboy boots with a "chipped" heel. She described the pickup as tan in color, medium sized, with a 4-wheel drive automatic transmission and an off-white canopy over the bed. She said the interior of the cab had bucket seats and "fuzzy" seat covers, cupholders between the seats, and something hanging from the rearview mirror. She described the canopy as having windows and a blue stripe down each side. Underneath the canopy, the bed of the truck was carpeted, and there was a separately covered spare tire. The canopy had a dome light that was broken, and the man had written on the underside of the roof of the canopy with what appeared to be a felt-tip pen.

At about 10 p.m. on March 23, 1989, a man accosted C, a 22-year-old woman, as she walked on the street in Vancouver. Saying he had a handgun in his pocket, he forced her to get into a nearby pickup truck, the bed of which was covered by a canopy. As they drove, he forced her to remove her shoes. He also offered her cocaine. After crossing the Columbia River into Oregon, he parked at an isolated location and told her to move into the bed of the truck, under the canopy. When she refused, they stayed in the passenger compartment, where he raped her repeatedly. After the

rapes, he handed her a towel. Then he drove back to Vancouver and released her.

C immediately reported the attack to the police. She described her attacker as a white male, approximately 40 years old, 5 feet 10 inches to 5 feet 11 inches, short, blonde hair, mustache, a good build, possibly two tattoos with heart designs, and a scar extending from his stomach to his chest. She said he was wearing a striped polo shirt, blue jeans, and white tennis shoes, and that he smoked during the abduction. She said his pickup was tan in color, medium sized, 4-wheel drive, with an automatic transmission and an off-white canopy over the bed. She said the interior of the cab had bucket seats with imitation sheepskin covers, a gold chain hanging from the rearview mirror, a pillow and towels.

At about 8:45 p.m. on March 31, 1989, a man approached B, a 19-year-old woman, in a parking lot in Vancouver. Grabbing her from behind, he said, "Do not run, do not scream, do not do anything or I will hurt you. Do you understand?"[1] B responded by delivering an elbow to his ribcage. He was knocked to the ground, and she ran to her car. After she was in her car, she watched him drive away in a pickup truck.

B immediately reported the attack to the police. She described her attacker as a white male, 30 to 40 years old, 5 feet 9 inches, stocky, short, with light brown hair. She said he was wearing a tan sport coat, blue jeans, and snakeskin boots with white stitching. She described his truck as a tan Ford Ranger pickup, with a light-colored canopy that had windows and a dark, horizontal stripe running down each side.

At about 8:45 p.m. on April 13, 1989, N, a 20-year-old woman, was walking on a street in Portland, Oregon, when a man who said he had a gun grabbed her from behind and told her not to scream. When she screamed anyway, the man slapped her and shoved a handgun into her side. He

[1]Clerk's Papers, at 223; Report of Proceedings, at 511.

then forced her to enter the cab of a nearby pickup truck. They drove to an isolated location, where the man forced her to get in the back of the truck and take off her clothes. He then raped her repeatedly. At one point, he offered her cocaine, which she refused. After the rapes, he gave her a towel. He then drove back to the Portland area, where he released her.

N immediately reported the attack to the police. She described the attacker as a white male, 30 years old, 5 feet 9 inches tall, blonde hair, mustache, and muscular build. She said he was wearing a striped polo shirt, blue jeans and white tennis shoes. She said the pickup was pale yellow, full-sized, with a white canopy that had windows. She said the interior of the cab had a gold chain hanging from the rear-view mirror. She said there was carpet under the canopy, and that towels and pillows were lying on the carpet.

At about 8:45 p.m. on April 19, 1989, T, an 11-year-old girl, was walking on a street in Hillsboro, Oregon, when a man who said he had a gun forced her to enter the cab of a nearby pickup truck. As they drove, he made her remove much of her clothing. Upon arriving at an isolated location, he parked and forced her to get in the back of the truck, where he raped her repeatedly. Then he drove back to Hillsboro and released her.

T immediately reported the attack to the police. She described her attacker as a white male, 30 to 40 years old, 5 feet 10 inches to 6 feet tall, blonde hair, mustache, muscular build, with a tattoo on his upper left arm. She said he was wearing a striped polo shirt, blue jeans and white tennis shoes, and that he smoked during the abduction. T described the pickup as a tan four-by-four with a canopy. She said the interior of the cab had bucket seats with sheepskin covers, cupholders, and pillows. She said the canopy was white, with a brown pinstripe running down each side. She said that the bed underneath the canopy was covered by carpet, that the light in the roof of the canopy was broken, and that the underside of the roof of the canopy

appeared to have been written on with a felt-tip pen. She said that a spare tire and towels were on the bed of the truck, under the canopy.

At about 2 a.m. on May 6, 1989, A, a 56-year-old woman, was walking on the street in Vancouver when a man who said he had a gun grabbed her and forced her to enter the cab of a nearby pickup truck. As they drove, he forced her to remove her shoes and nylons, and to fellate him. When her mouth became numb, he explained he was high on drugs and had put cocaine on his penis. Upon arriving at an isolated location in Oregon, he forced her to get in the back of the truck, under the canopy. He raped her repeatedly, then gave her a towel that had been in the back of the truck. Ultimately, he drove to Jantzen Beach and released her.

A immediately reported the attack to the police. She described her attacker as a white male, in his early 30's, 5 feet 9 inches, short blonde hair, mustache, stocky, with a muscular build. She said he was wearing a white and gray striped shirt, gray pants and white tennis shoes. She said his pickup truck was mustard yellow, full-sized, with a 4-wheel-drive shifter on the floor and a light-colored canopy. She said the interior of the cab had bucket seats with velvet textured seatcovers, cupholders, a gold necklace hanging from the rearview mirror, and pillows. She said there were towels under the canopy, and that the bed under the canopy was covered.

On May 8, 1989, Herzog's ex-stepson contacted the police. He said he had seen an artist's sketch of the attacker in the newspaper and believed it "could be [Herzog]."[2] He qualified his statement by saying the sketch was not a "good depiction" of Herzog. His description of Herzog matched that given by the six women, including the fact that Herzog sported a "double-hearted tattoo". He also said that Herzog drove a "1970 or early 1970's Chevrolet four-wheel-drive pickup truck, yellow in color".[3] He said he had been sexually molested by Herzog in the past.

---

[2]Report of Proceedings, at 76-77.

[3]Report of Proceedings, at 78.

The police obtained a photo of Herzog, which showed a person "distinct[ly] similar" to the description the six women had given. They confirmed through licensing records that Herzog owned a "four-wheel-drive Chevrolet", and through arrest records that Herzog previously had been charged with a sex crime in King County. His exstepson was the alleged victim, and the charge had ultimately been dismissed.

After ascertaining that Herzog worked at the Freightliner Corporation in Portland, the police went there to conduct further investigation. In Freightliner's parking lot, they saw a "four-wheel-drive Chevrolet pickup truck with a canopy that met the general description of what we were looking for . . .."[4] They also saw a chain hanging from the truck's rearview mirror. They made these observations from the street, which was separated from the parking lot by 6 to 30 feet of landscaping.

The police sought permission from Freightliner's security department before entering Freightliner's parking lot. After permission was granted, several officers walked past the truck and looked through its windows. Although they did not enter the truck, or "even put [a] face against the window", they were able to see various items, including an automatic transmission, sheepskin seat covers, pillows, cupholders, towels, a covered spare tire, a broken light under the roof of the canopy, and writing under the roof of the canopy.

The police then met Herzog in Freightliner's offices. Observing that he resembled each victim's description of her attacker, they arrested him. After he was under arrest, they further observed a double-heart tattoo on his left shoulder and a scar on his stomach.

Later that day, the police obtained Oregon search warrants for Herzog's truck, for the room in which he was living, and for samples of his blood, saliva and hair. When they searched the truck, they seized the items they had

---

[4]Report of Proceedings, at 81.

seen while the truck was parked at Freightliner. When they searched the room, they seized a pair of brown cowboy boots with a chipped heel, a pair of snakeskin cowboy boots, a pair of white tennis shoes, and a polo-type shirt with blue and white stripes. They did not find a handgun.

Lineups were held within a short time. Each of the six women identified Herzog as her attacker.

As the investigation continued, the police contacted the King County Prosecutor's office to find out why the charge involving the ex-stepson had been dismissed. The reason, they were told, was that the ex-stepson had recanted his allegations.

Later in 1989, Herzog was tried in Oregon for the attacks on C, N, T, and A. He was convicted on 17 counts of kidnapping, rape, sodomy, and sexual abuse. He was sentenced to 435 years in prison, and the sentence was affirmed on appeal. *State v. Herzog*, 108 Or. App. 779, 815 P.2d 1295 (1991), *review denied*, 313 Or. 75 (1992).

Also in 1989, Washington charged Herzog with the first degree kidnapping of S (count 1), the first degree rape of S (count 2), the attempted first degree kidnapping of B (count 3), and the second degree assault of B (count 4). Before trial, he moved to suppress the evidence seized pursuant to the Oregon search warrants. The trial court denied the motion.

Before trial, Herzog moved to exclude evidence of the crimes involving C, A, N and T. The trial court denied the motion with respect to C, but granted it with respect to A, N and T.

Before trial, Herzog moved to sever the counts involving S from the counts involving B. The court denied the motion.

S, B and C all testified at trial. Each described the incident in which she had been involved, and each identified Herzog as her attacker.

The State introduced various items of tangible evidence seized as a result of the Oregon search warrants. That evidence tended to corroborate the victims' testimony, and to connect Herzog with the attacks.

Herzog called several witnesses and testified on his own behalf. He denied perpetrating any of the incidents.

The jury convicted on all counts. At sentencing, the trial court determined that counts 1 and 2 carried a standard range of 149 to 198 months, and that counts 3 and 4 carried a standard range of 111.75 to 148.5 months. The court imposed concurrent exceptional sentences of 360 months on counts 1 and 2, based in part on a finding of future dangerousness. The court imposed concurrent standard range sentences of 148.5 months on counts 3 and 4. The court ordered that counts 1 and 2 run consecutively with the sentences imposed in Oregon, and that counts 3 and 3 run concurrently with counts 1 and 2.

On appeal, Herzog contends that the trial court erred (1) by admitting C's testimony; (2) by denying his motion to sever the counts involving S from the counts involving B; (3) by denying his motion to suppress evidence; and (4) by imposing an exceptional sentence. We consider each contention in turn.

I

C's testimony constituted evidence that Herzog had committed an uncharged crime. According to the State, the evidence was admissible to prove identity. According to Herzog, the evidence was inadmissible because its probative value was substantially outweighed by unfair prejudice. We agree with the State. To show why, we discuss relevance first and unfair prejudice second.

A

Evidence is relevant if it has "any tendency" to prove a fact of consequence to the action. ER 401. The identity of the perpetrator of the crime charged is a fact of consequence in a criminal action. *See State v. Stanton*, 68 Wn. App. 855, 863, 845 P.2d 1365 (facts of consequence include elements of the crime). Therefore, evidence that the accused committed an uncharged crime is relevant if it has "any tendency" to prove the identity of the perpetrator of the crime charged.

 Evidence that the accused committed an uncharged crime can be relevant to identity of the perpetrator in as few as one or as many as three ways. The first way involves general propensity. Evidence that the accused committed an uncharged crime tends to prove that the accused has a propensity to commit crime. Evidence that the accused has a propensity to commit crime increases at least slightly the probability that the accused committed the crime charged. Thus, evidence that the accused committed an uncharged crime is relevant insofar as it tends to prove, through general propensity, that the accused committed the crime charged.[5]

The second way involves specific propensity. Evidence that the accused committed an uncharged crime *of the same type as the crime charged* tends to prove that the accused has a propensity to commit that specific type of crime. Evidence that the accused has a propensity to commit that specific type of crime increases, more strongly than before, the probability that the accused committed the particular crime charged. Thus, evidence that the accused committed an uncharged crime of the same type as the crime charged is relevant insofar as it tends to prove, through specific propensity, that the accused committed the particular crime charged.[6]

---

[5]Suppose, for example, that in a trial for burglary the court admits evidence showing that the accused previously committed an uncharged murder. Such evidence tends to show that the accused is a criminal (*i.e.*, a person of criminal character, or a person with a propensity for crime); and if the accused is a criminal, the chances that he or she committed the charged burglary are at least slightly increased.

[6]Suppose, for example, that in a trial for assault, the court admits evidence showing that the accused committed several prior assaults. Such evidence tends to show that the accused is a violent, assaultive person (*i.e.*, a person of violent or assaultive character, or a person with a propensity for violent and assaultive behavior); and if the accused is a violent or assaultive person, the chances that he or she committed the charged assault are increased.

Suppose, for another example, that in a trial for rape, the court admits evidence showing that the accused committed several prior rapes. Such evidence tends to show that the accused is a rapist (*i.e.*, a person of sexually deviant character, or a person with a propensity to rape); and if the accused is a rapist, the chances that he or she committed the charged rape are increased.

The third way does not involve propensity at all. Rather, it depends on a 3-step process of logical deduction.

The initial step is to compare *the facts* of the uncharged crime to *the facts* of the charged crime.[7] The object is to determine whether *the same* person committed both crimes.[8] It is not necessary to know or consider who com-

---

[7]For Washington cases in which a comparison *of facts* was sufficient to show that *the same* person committed both crimes, see *State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989), *State v. Laureano*, 101 Wn.2d 745, 682 P.2d 889 (1984), *State v. Lynch*, 58 Wn. App. 83, 792 P.2d 167, *review denied*, 115 Wn.2d 1020 (1990), and *State v. Bradford*, 56 Wn. App. 464, 783 P.2d 1133 (1989). For Washington cases in which a comparison *of facts* was insufficient to show that *the same* person committed both crimes, see *State v. Smith*, 106 Wn.2d 772, 725 P.2d 951 (1986), *State v. Coe*, 101 Wn.2d 772, 684 P.2d 668 (1984), and *State v. Saltarelli*, 98 Wn.2d 358, 655 P.2d 697 (1982).

[8]The principle stated in the text has been impliedly recognized in Washington cases which state that the method used to perpetrate the uncharged act must be so unique as to create a high probability that the accused also perpetrated the charged act. *E.g.*, *State v. Brown*, 113 Wn.2d at 527; *State v. Smith*, 106 Wn.2d at 777; *State v. Coe*, 101 Wn.2d at 777; *State v. Laureano*, 101 Wn.2d at 745.

The principle stated in the text has been recognized in many other jurisdictions. *United States v. Perkins*, 937 F.2d 1397, 1400 (9th Cir. 1991); *United States v. Garcia-Rosa*, 876 F.2d 209, 225 (1st Cir. 1990); *United States v. Ezzell*, 644 F.2d 1304 (9th Cir. 1981); *United States v. Pisari*, 636 F.2d 855, 859 (1st Cir. 1981); *People v. Santos*, 1 Guam 474, 476-78 (D. Guam. App. Div. 1978); *State v. Brown*, 125 Ariz. 160, 161, 608 P.2d 299, 300 (1980); *People v. Nible*, 200 Cal. App. 3d 838, 848-49, 247 Cal. Rptr. 396, 402 (1988); *People v. Jackson*, 102 Cal. App. 3d 620, 624, 162 Cal. Rptr. 574, 576-77 (1980); *People v. Matson*, 13 Cal. 3d 35, 40-41, 528 P.2d 752, 117 Cal. Rptr. 664, 667 (1974); *People v. Bueno*, 626 P.2d 1167, 1170 (Colo. Ct. App. 1981); *State v. Murrell*, 7 Conn. App. 75, 80, 507 A.2d 1033, 1036 (1986); *Groves v. United States*, 564 A.2d 372, 376-77 (D.C. 1989), *modified*, 574 A.2d 265 (1990); *State v. Martin*, 118 Idaho 334, 337, 796 P.2d 1007, 1010 (1990); *People v. Kokoraleis*, 154 Ill. App. 3d 519, 524-25, 507 N.E.2d 146, 148-49 (1987); *Holmes v. State*, 511 N.E.2d 1060, 1061 (Ind. 1987); *Jackson v. State*, 446 N.E.2d 344, 347 (Ind. 1983); *Randolph v. State*, 361 N.E.2d 900, 901 (Ind. 1977); *State v. Nunn*, 244 Kan. 207, 212-13, 768 P.2d 268, 274 (1989); *State v. Breazeale*, 238 Kan. 714, 721, 714 P.2d 1356, 1361-62, *cert. denied*, 479 U.S. 846 (1986); *State v. Churchill*, 231 Kan. 408, 414-15, 646 P.2d 1049, 1055 (1982); *State v. Gaines*, 340 So. 2d 1294, 1297-98 (La. 1976); *People v. Lee*, 434 Mich. 59, 94-95, 450 N.W.2d 883, 899, *cert. denied*, 498 U.S. 879 (1990); *State v. Brooks*, 810 S.W.2d 627, 631 (Mo. Ct. App. 1991); *State v. Garfole*, 76 N.J. 445, 452 n.2, 388 A.2d 587, 590 (1978); *State v. Stager*, 329 N.C. 278, 303, 406 S.E.2d 876, 890-91 (1991); *State v. Green*, 321 N.C. 594, 604, 365 S.E.2d 587, 593, *cert. denied*, 488 U.S. 900 (1988); *State v. Johnson*, 313 Or. 189, 195-96, 832 P.2d 443, 446-47 (1992); *State v. Collins*, 73 Or. App. 216, 221-22, 698 P.2d 969, 972 (1985); *Commonwealth v. Perkins*, 519 Pa. 149, 154, 546 A.2d 42, 44 (1988); *State v. Roberson*, 846 S.W.2d 278, 280 (Tenn. Crim. App. 1992);

mitted either crime, and thus the accused's propensities are not involved.

The next step is to determine whether the accused committed the uncharged crime.[9] *See State v. Robtoy*, 98 Wn.2d 30, 42, 653 P.2d 284 (1982) ("other crime must be connected to the defendant"). This determination must be made in accordance with the ordinary Rules of Evidence, *e.g.*, ER 602 (personal knowledge testimony) and ER 803(22) (certain judgments of conviction),[10] and those rules do not implicate the accused's propensities.

The last step is merely the syllogistic result of the first two. If *the same* person committed the charged and uncharged crimes, and if the accused committed the uncharged crime, it can be logically deduced, independently of propensity, that the accused is the person who committed the charged crime. Evidence meeting all three steps is commonly labeled evidence of a "signature crime", evidence of "modus operandi", or, as in ER 404(b), evidence of "identity". *See State v. Bowen*, 48 Wn. App. 187, 193, 738 P.2d 316 (1987); Robert H. Aronson, *Evidence in Washington* 404-18

*State v. Jones*, 656 P.2d 1012, 1014 (Utah 1982); *Spencer v. Commonwealth*, 240 Va. 78, 89, 393 S.E.2d 609, 616, *cert. denied*, 498 U.S. 908 (1990); *White v. Commonwealth*, 9 Va. App. 366, 369, 388 S.E.2d 645, 646 (1990).

The principle stated in the text has been recognized by various textwriters. Robert H. Aronson, *Evidence in Washington* 404-18 (2d ed. 1993); Edward J. Imwinkelreid, *Uncharged Misconduct Evidence* § 3.10, at 23 (1984); 2 Jack B. Weinstein & Margaret A. Berger, *Evidence* ¶ 404[16], at 127-29 (1985).

[9]For cases that illustrate this principle, see *Huddleston v. United States*, 485 U.S. 681, 685, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988); *State v. Brown*, 125 Ariz. 160, 161-62, 608 P.2d 299, 300-01 (1980); *Randolph v. State*, 266 Ind. 179, 182, 361 N.E.2d 900, 901 (1977); *State v. Stager*, 329 N.C. 278, 303, 406 S.E.2d 876, 890 (1991); *People v. Robinson*, 68 N.Y.2d 541, 549, 503 N.E.2d 485, 510 N.Y.S.2d 837, 842 (1986); *People v. Barton*, 151 A.D.2d 587, 588, 542 N.Y.S.2d 689, 690 (1989); *White v. Commonwealth*, 9 Va. App. 366, 369, 388 S.E.2d 645, 646 (1990).

[10]Illustrative cases from other jurisdictions include *Franklin v. State*, 189 Ga. App. 405, 408, 376 S.E.2d 225, 228 (1988) (final judgment of conviction); *Holmes*, 511 N.E.2d at 1061 (testimony based on personal knowledge); *Jackson*, 446 N.E.2d at 347 (testimony based on personal knowledge); *Nunn*, 244 Kan. at 213-14 (testimony based on personal knowledge); *Churchill*, at 413 (final judgment of conviction).

(2d ed. 1993); John W. Strong, *McCormick on Evidence* 801-03 (4th ed. 1992); Edward J. Imwinkelreid, *Uncharged Misconduct Evidence* § 3.10, at 23 (1984); 2 Jack B. Weinstein & Margaret A. Berger, *Evidence* 404[16], at 127-29 (1985).

Incidentally, this 3-step process of logical deduction was recently noted and utilized by the United States Supreme Court. In *Estelle v. McGuire,* 502 U.S. 62, 116 L. Ed. 2d 385, 112 S. Ct. 475 (1991), the defendant was charged with the second degree murder of his infant child. The trial court admitted evidence on "battered child syndrome" and instructed the jury on how such evidence could be used. The defendant contended that the instruction violated his right to due process, because, he said, it "constituted a 'propensity' instruction, allowing the jury to base its determination of guilt in part upon the conclusion that [he] had committed the prior acts and therefore had a propensity to commit this type of crime." 116 L. Ed. 2d at 400. The Supreme Court ruled:

> While the instruction was not as clear as it might have been, we find that there is not a "reasonable likelihood" that the jury would have concluded that this instruction, read in the context of other instructions, authorized the use of propensity evidence . . .. It seems far more likely that the jury understood the instruction . . . to mean that *if* it found a "clear connection" between the prior injuries and the instant injuries, and *if* it found that McGuire had committed the prior injuries, then it could use that fact in determining that McGuire committed the crime charged. The use of the evidence of prior offenses permitted by this instruction was therefore parallel to the familiar use of evidence of prior acts for the purpose of showing . . . identity . . .. See, e.g., Fed. Rule of Evid 404(b).

(Citations omitted.) 116 L. Ed. 2d at 400.

Here, C's testimony was relevant in the first way we have described. It showed that Herzog had committed an uncharged crime. This in turn tended to show that he was a criminal (*i.e.,* that he had a propensity to commit crime in general). And if he was a criminal, the chances that he had committed the crimes involving S and the crimes involving B were at least slightly increased.

C's testimony was also relevant in the second way we have described. It showed that Herzog had committed not just an uncharged crime, but an uncharged rape. This in turn tended to show that he was a rapist (*i.e.*, that he had a propensity to rape). And if he was a rapist, the chances that he had committed the rape of S and the attempted rape of B were greater than otherwise.

C's testimony was also relevant in the third way we have described. When the details of the uncharged rape involving C are compared to the details of the charged rape involving S, without regard to who committed either crime, the inference that the same person committed both is virtually inescapable. Similarly, when the details of the uncharged rape involving C are compared to the details of the charged attempted rape on B, without regard to who committed either crime, the inference that the same person committed both clearly preponderates. C gave eyewitness testimony that Herzog had committed the rape on her. *See* ER 602. It logically follows, independently of Herzog's general or specific propensities, that he was the one who perpetrated the rape on S and the attempted rape on B.

## B

Evidence of an uncharged crime is not admissible merely because it is relevant. *See* ER 402. In addition, it is necessary to consider the balance between probative value and unfair prejudice. ER 402-404; *State v. Kelly,* 102 Wn.2d 188, 198, 685 P.2d 564 (1984); *State v. Saltarelli,* 98 Wn.2d 358, 361-62, 655 P.2d 697 (1982); *State v. Robtoy,* 98 Wn.2d 30, 42, 653 P.2d 284 (1982); *State v. Stanton,* 68 Wn. App. 855, 860, 845 P.2d 1365 (1993).

When evidence of an uncharged crime is relevant *only because it shows the accused's general or specific propensities,* the balance between probative value and unfair prejudice is controlled by ER 404(a) and the first sentence of ER 404(b). ER 404(a) provides generally:

> Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . ..

The first sentence of ER 404(b) provides more specifically:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. . . .

The underlying reasoning was explained in *Michelson v. United States*, 335 U.S. 469, 93 L. Ed. 168, 69 S. Ct. 213 (1948), in which the Court said:

> The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is *by propensity* a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

(Footnotes omitted. Italics ours.) 335 U.S. at 475-76; *see also State v. Brown*, 125 Ariz. 160, 161, 608 P.2d 299 (1980) ("jury may conclude that the defendant is a 'bad man' and convict on lesser evidence than would ordinarily be necessary to support a conviction") (quoting *State v. Babineaux*, 22 Ariz. App. 322, 325, 526 P.2d 1277, 1280 (1974)).

When evidence of an uncharged crime is relevant *not only because it shows the accused's propensities, but also because it shows "identity" independently of propensity,* the balance between probative value and unfair prejudice is governed by the second sentence of ER 404(b), and by ER 403. The second sentence of ER 404(b) provides that evidence of an uncharged crime *may* be admissible for a purpose "such as proof of . . . identity . . .". It counteracts the exclusionary language that precedes it, but it does not command that evidence of an uncharged crime be admitted. *See* Aronson, at 404-18; Cleary, at 801-03; Imwinkelreid § 3.10, at 23; Weinstein & Berger ¶ 404[16], at 127-29. Rather, the question of admissibility turns on ER 403. *Robtoy*, 98 Wn.2d at 42; Fed. R. Evid. 404(b) advisory committee's note, 56 F.R.D. 183, 221 (1972). Under that rule, evidence is admissi-

ble when its probative value is not substantially outweighed by the danger of unfair prejudice, and the balance between probative value and unfair prejudice is a matter for the discretion of the trial court. *Stanton,* 68 Wn. App. at 861; *Bowen,* 48 Wn. App. at 190.

In this case, as we have already noted, C's testimony was relevant not only because it tended to show Herzog's general and specific propensities, but also because it provided a basis from which to deduce, independently of propensity, that Herzog was the one who had perpetrated the crimes against S and B. As a result, the trial court was not required to exclude it by virtue of ER 404(a) and the first sentence of ER 404(b). Instead, the trial court had discretion to balance probative value against unfair prejudice pursuant to ER 403 and the second sentence of ER 404(b). The court did not abuse its discretion in striking the balance as it did, and C's testimony was properly admitted.

## C

We summarize this part of our discussion as follows. Evidence of an uncharged crime is always relevant to prove the identity of the perpetrator of the crime charged. Usually, it is relevant solely because it tends to prove the perpetrator's propensities. Occasionally, it is also relevant without regard to the perpetrator's propensities. When it is relevant solely because of the perpetrator's propensities, it must be excluded. ER 404(a); ER 404(b) (first sentence). When it is relevant independently of the perpetrator's propensities, the trial court has discretion to balance its probative value (when viewed independently of propensity) against the danger of the unfair prejudice. ER 404(b) (second sentence); ER 403. Here, C's testimony was relevant independently of propensity. Thus, the trial court had discretion to balance, and it did not abuse that discretion in balancing as it did.

## II

■ ■ Herzog claims the trial court erred in failing to sever the counts involving S from the counts involving B.

CrR 4.3(a) states that two or more offenses can be joined for trial when each is "of the same or similar character, even if not part of a single scheme or plan". However, offenses must be severed if the trial court determines "that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). Factors to be considered include

> (1) the strength of the State's evidence on each count; (2) the clarity of defenses to each count; (3) the court's instruction to the jury as to the limited purpose for which it was to consider the evidence of each crime; and (4) the admissibility of the evidence of the other crimes even if they had been tried separately or never charged or joined.

*State v. Eastabrook*, 58 Wn. App. 805, 811-12, 795 P.2d 151, *review denied*, 115 Wn.2d 1031 (1990). A trial court's ruling will be reversed only for abuse of discretion. *State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992) (quoting *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)).

The first three factors were met here. The State's case was strong on all counts. Herzog's defense to all counts was a general denial. The court instructed the jury to consider each count separately, and not let the verdict on one control its verdict on another.

The fourth factor was also met. Evidence of the incident involving S was admissible to prove who attempted to rape B. It tended to identify Herzog, independently of propensity, as the perpetrator of the incident involving B. Moreover, its probative value for that purpose was not substantially outweighed by its tendency to generate unfair prejudice (*i.e.*, by its tendency to show identity through propensity). For similar reasons, evidence of the incident involving B was admissible to prove who raped S. The two incidents were cross admissible,[11] and the trial court did not err by denying the motion to sever.

---

[11]Herzog's reliance on *State v. Harris*, 36 Wn. App. 746, 677 P.2d 202 (1984) and *State v. Ramirez*, 46 Wn. App. 223, 730 P.2d 98 (1986) is misplaced. In each of those cases, the evidence was not cross admissible, whereas here it is. The prejudice present in *Harris* and *Ramirez* is not present here.

## III

Herzog contends the trial court erred by not suppressing various items of evidence. We subdivide his arguments into four parts, all of which we decide by applying federal and Washington law. Neither Herzog nor the State argues that Oregon law should be applied, and neither cites nor relies on any Oregon authorities.

### A

Herzog argues that the police conducted an illegal search when they observed his truck in the parking lot. We disagree.

▆ The Fourth Amendment applies when government agents conduct a "search". *United States v. Jacobsen*, 466 U.S. 109, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984). Government agents conduct a "search" when they infringe upon a person's constitutionally protected expectation of privacy. *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). Conversely, government agents do not conduct a "search" when they make observations from a place where they have the right to be. As our Supreme Court has said:

> [W]hen a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a "search" within the meaning of the Fourth Amendment.

*State v. Campbell*, 103 Wn.2d 1, 23, 691 P.2d 929 (1984) (allowing officers to look through windows of automobile parked on public streets) (quoting *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981)), *cert. denied*, 471 U.S. 1094 (1985); *State v. Kennedy*, 107 Wn.2d 1, 10, 726 P.2d 445 (1986); *State v. Young*, 28 Wn. App. 412, 416, 624 P.2d 725 (same as *State v. Campbell, supra*), *review denied*, 95 Wn.2d 1024 (1981).

Here, the officers stood on the public street and looked at the truck. Then, with Freightliner's permission, they walked through the parking lot and looked into the truck.

These activities did not involve anything other than observing, from lawful vantage points, things in open view. There was no search, and the Fourth Amendment did not apply.

## B

Herzog argues that when he was arrested at Freightliner, the police lacked probable cause to believe he had committed the crimes. Again, we disagree.

■ Even when made in a public place, an arrest must be supported by probable cause. *United States v. Watson*, 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820 (1976). "Probable cause exists 'where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been . . . committed.' " *State v. Fricks*, 91 Wn.2d 391, 398, 588 P.2d 1328 (1979) (quoting *State v. Gluck*, 83 Wn.2d 424, 426-27, 518 P.2d 703 (1974). "The question of probable cause should not be viewed in a hypertechnical manner." *State v. Remboldt*, 64 Wn. App. 505, 510, 827 P.2d 282, *review denied*, 119 Wn.2d 1005 (1992).

The police had probable cause to arrest when they took Herzog into custody at Freightliner. Several of the women had said their attacker had a distinctive tattoo on his arm, and Herzog's ex-stepson had said Herzog wore that kind of tattoo. The women had described the attacker's person, and the police had observed that Herzog fit the description. The women had described the vehicle of their attacker in great detail — a light colored (tan or yellow) Ranger-type pickup, with a canopy that had a stripe on each side, automatic transmission, 4-wheel-drive shifter, fuzzy seat covers, cupholders, towels, pillows, gold chain hanging from the rearview mirror, writing on the underside of the roof of the canopy, broken light under the canopy — and the police had confirmed those details by their own lawful observations. The police had also confirmed through state records that the truck was owned by Herzog. Viewed in combina-

tion, these facts and circumstances were such that a person of reasonable caution would have believed that Herzog had committed the crimes in question.

## C

Herzog argues that the police made intentional or reckless omissions in the affidavit supporting the Oregon search warrants. Again, we disagree.

■ An omission or incorrect statement made in support of a search warrant may invalidate the warrant if it was (1) material, and (2) made deliberately or with reckless disregard for the truth. *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985). "Allegations of negligence or innocent mistake are insufficient." *Franks v. Delaware*, 438 U.S. 154, 171, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978); *Seagull*, 95 Wn.2d at 908. The defendant bears the burden of establishing the necessary facts. *State v. Garrison*, 118 Wn.2d 870, 872, 827 P.2d 1388 (1992) (quoting *Franks*, 438 U.S. at 155-56).

Herzog says the police recklessly omitted to include in the search warrant affidavit the fact that his ex-stepson had recanted his sexual abuse charge against Herzog. However, the police included in the affidavit the fact that the charge had been dismissed, and they did not discover that the dismissal was due to the ex-stepson's recantation until *after* the search warrants had been issued. Nothing indicates that the failure to discover the recantation was intentional or reckless; indeed, nothing indicates that it was even negligent, in view of the rapidity with which events were unfolding at the time. We hold that the failure to state that the ex-stepson had recanted does not affect the legality of the search warrants.

Herzog also says the police recklessly omitted to state in the affidavit that before they went to Freightliner, the ex-stepson had qualified his identification of Herzog by saying the artist's sketch "could be" him but was not a "good depiction". According to testimony given later at trial, the ex-

stepson actually told the police that the depiction was "similar . . . it could be him". Moreover, even if the ex-stepson's qualifying words had been included in the affidavit, nothing would have changed, for with or without such words, the affidavit contained a wealth of information demonstrating probable cause. There was no material omission from the affidavit.

## D

Herzog argues the affidavit did not establish probable cause to search (1) his person for blood, saliva and hair; (2) his vehicle; or (3) the room in which he was living. Again, we disagree.

An affidavit establishes probable cause to search "if a reasonable, prudent person would understand from the facts contained in the affidavit that a crime has been committed, and evidence of the crime can be found at the place to be searched." *State v. Garcia,* 63 Wn. App. 868, 871, 824 P.2d 1220 (1992). A reviewing court must accord great deference to the magistrate's determination of probable cause, *State v. Coates,* 107 Wn.2d 882, 888, 735 P.2d 64 (1987), and "[d]oubts should be resolved in favor of the warrant's validity." *State v. Wilke,* 55 Wn. App. 470, 476, 778 P.2d 1054, *review denied,* 113 Wn.2d 1032 (1989).

The affidavit established probable cause to search Herzog's person for blood, saliva and hair. It gave reason to believe Herzog had committed the rapes, as discussed above in connection with probable cause to arrest. It showed that after Herzog was under arrest, the police confirmed through their observations that he had both a double-heart tattoo on his arm and a scar on his stomach. It showed that each rape victim had been medically examined, and that rape kits had been completed for later comparison. Read as a whole, it showed probable cause to believe that samples of Herzog's blood, saliva and hair would have evidential value.

The affidavit also established probable cause to search Herzog's truck. It showed that Herzog was probably the

rapist being sought, and that the police had personally observed in the truck a variety of specific items matching descriptions given by the victims.

The affidavit established probable cause to search Herzog's room. It showed probable cause to believe Herzog was the rapist being sought, and that the victims had described clothing and various other items that normally would be kept in one's home. As a result, it contained information sufficient to warrant a reasonably prudent person in the belief that items of evidential value would be found in Herzog's room. *State v. Gross*, 57 Wn. App. 549, 554, 789 P.2d 317 (quoting *United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir. 1978)), *review denied*, 115 Wn.2d 1014 (1990); *State v. Fagundes*, 26 Wn. App. 477, 482, 614 P.2d 198, 625 P.2d 179 (quoting *United States v. Valenzuela*, 596 F.2d 824, 828 (9th Cir.), *cert. denied*, 441 U.S. 965 (1979)), *review denied*, 94 Wn.2d 1014 (1980); *see State v. Chasengnou*, 43 Wn. App. 379, 386, 717 P.2d 288 (1986).

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ALEXANDER, J., and PETRICH, J. Pro Tem., concur.

Review denied at 124 Wn.2d 1022 (1994).